[Crim. No. 3194. First Dist., Div. Two. June 19, 1956.]

THE PEOPLE, Respondent, v. MARY GRASSO, Appellant.

Joseph J. Polverino and Henry Mariani for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, John S. McInerny, Deputy Attorney General, and N. J. Menard, District Attorney (Santa Clara), for Respondent.

KAUFMAN, J.—Appellant, Mary Grasso, appeals from a judgment of conviction after jury verdict of murder in the first degree. The jury found that she was not armed at the time of commission of the offense, and recommended life imprisonment.

Mary Grasso and two codefendants, Julio Grasso and

Patricia Perry, were charged with the murder of Mary's husband, Joseph Grasso, on January 12, 1955. Appellant pleaded "not guilty." Her motion for a separate trial was denied.

Joseph Grasso was killed at approximately 1:55 a. m. on the morning of January 12, 1955, in the bar of the Club Capri, a combination restaurant and bar in Madrone, California, owned by him and his wife, appellant Mary Grasso. Julio Grasso, a son of Joseph by a prior marriage, killed him by shooting him in the back of the head five times with a .38 caliber pistol. Julio was living with the couple at the time in quarters in the rear of the building. Also living there were the two young sons of Joseph and Mary, as well as Patricia Perry, a 23-year-old girl who received food, lodging and clothing in return for her services as a waitress in the bar and restaurant.

Joseph Grasso was in his sixties, while Mary, his third wife, was about 33 years of age. The marriage was a stormy one. In 1943 Joseph had taken five shots at Mary, and she on several occasions had openly stated in the presence of other persons that she wished he was dead. It appears also that Mary had been going out with a certain Don Casillas for some time prior to the shooting.

At about 5 p. m. on January 11, Mary came weeping into the kitchen of the restaurant after a quarrel with Joseph. According to a statement given by Julio to the district attorney after the shooting, and concurred in by Patricia Perry and Mary Grasso, Julio and Patricia were talking in the kitchen at the time Mary entered. When Mary told them why she was crying, Patricia said they should get rid of the old man, and asked Mary if she wanted to, to which she replied, "Yes." Patricia then said that they had someone there who would do it for a little money, that money talks. Julio said he would do it. It was decided that it would be done that night. Various possible alibis were then discussed. Julio left for a party at a friend's house. Upon his return at about 1 a. m., he returned to the bar. Joseph Grasso was there and there were two customers. He sat down at the lunch counter with a cup of coffee. Mary Grasso, Patricia Perry and Don Casillas were there drinking coffee. The two customers left and Don Casillas left shortly before the killing.

Julio went into the bar at about 1:55 a. m. with his revolver. His father was closing up for the night. While Joseph was taking the money out of the cash register, Julio shot him five times in the back of the head. Appellant and Patricia

then came into the room, and after they reloaded the pistol in case Joseph was not dead, they took the money from the cash box and placed it together with the empty shells and the pistol in a bag which they hid in the attic. The idea was to make it appear that there had been a robbery in the course of which Joseph had been shot.

Appellant then called the sheriff's office in San Jose reporting a robbery and the shooting. Julio and Patricia told the officers that Julio had been slugged by the robbers as he was trying to lock the front door of the bar, and that they then robbed and shot Joseph while Julio was unconscious. Julio said that as he awoke, the two women were just coming into the room, and he saw his father lying behind the bar. During the early morning hours when deputy sheriffs and doctors were conducting an investigation, appellant was resting, having been given sedatives.

Appellant and Patricia were taken in to the Morgan Hill police station at about 2 p. m. on the afternoon of January 12th by Inspectors Goudy and Hooton of the Santa Clara sheriff's office, where statements were taken from them. Both stated that they had been in bed when they heard the shots, that as they rushed in they saw Julio just getting up off the floor where he had been slugged by the robbers, that Joseph must have been shot by the robbers. The woman were then brought back to the Club Capri and Julio was brought into San Jose for questioning. Julio first told his original story about the robbery, but when he was caught in a lie about the ownership of a pistol, he then told a story of having sold the pistol to a stranger whom he did not know. Meanwhile, another deputy sheriff was searching the Club Capri. He found the bag containing the gun and the money. When Julio was told of this and asked if he would tell the truth, he said he would wait until the gun was brought in. While they were waiting Julio told the officers that he knew he couldn't get away with it, and described how it had actually happened. He said that he wasn't sorry as Joseph was better off.

After the deputy arrived with the gun, Julio admitted that he had used it to kill Joseph. He said that when he returned home from the party he found appellant crying after an argument with Joseph and that she then offered him $3,000 to get rid of Joseph. Patricia was present during the discussion. He said he agreed because he thought if he had the money he could become reconciled with his wife, from whom

he was then estranged. He said appellant had previously mentioned to him about having someone else kill Joseph, but this was the first time she had talked to him about doing it.

Appellant was then informed that Julio had confessed. She exclaimed, "Oh, my God, why did he do it."

Later that evening, at about 8:30 p. m., Patricia Perry was again interrogated. Patricia generally agreed to the truth of Julio's story, but insisted that she had only been kidding with him when she proposed that he kill his father. She said she was sleepy and would give them a statement in the morning.

At about 9:15 p. m. appellant was questioned. She stated that they had been discussing the killing of Joseph at about 6 p. m. on the evening of January 11th, and that Julio was willing to do it if he were paid. When Julio returned later that evening, she said they planned the murder. She said Julio could have the money in the safe which she thought was a little over a thousand dollars, and that she would give him more later if he needed it. He then shot Joseph, and she and Patricia came into the room, reloaded the gun, and hid the gun and money in the attic. She denied that Julio was to get $3,000, or that Patricia was to get anything, that Patricia had helped because Joseph had treated them all so badly. She then related what a terrible life she had had with him, telling of various incidents of his violence and cruelty. She admitted telling many people that she had wished he was dead.

Still later that same evening, the inspectors took Julio and Patricia to a hotel in San Jose, and again took statements from them in the hotel room which were taken down by a stenographic reporter. Patricia again admitted the conversation with Julio about killing his father for money, but said she thought he was kidding, so she kidded along with him. She told Mary Grasso later about the conversation, but didn't realize that she took it seriously. When Julio returned that night, the subject was discussed again, and appellant told Julio he could have what money was in the safe. Julio then went into the bar and shot his father, and when she and Mary heard the shots they went in and cleaned out the cash register, and hid the money and gun. Patricia still maintained that she didn't think Julio was going to kill Joseph, and that she still didn't think he had done it.

Another statement was taken from Julio which was quite similar to the story he told earlier that evening. He said that they had discussed possible alibis after his return from the

party that night, and had decided on the one of the faked robbery.

On the following day, January 13th, a final statement was taken at the district attorney's office in San Jose. These conversations were all taken down by a court reporter. Julio again admitted killing his father, related a conversation in which Patricia had asked appellant if she wanted to get rid of the old man, to which appellant had answered "Yes." He stated that Patricia told Mary that there was someone there who would do it for a little money, and Julio had said that it was he. He then said that they "just talked it out there" and that he then went to his friend's house. He admitted that they had decided to do it that night, and that alibis were discussed.

Patricia stated that the matters related by Julio were correct. She admitted being willing to help with the plan because of the manner in which Joseph treated appellant and the family.

Appellant was then asked if she had heard the statements of Julio and Patricia. She replied that she had and said that none of their statements was incorrect. She was asked if it was true that when she had come into the kitchen Patricia had said something to her about getting rid of the old man, and that there was somebody to do it and that money talks, and again, if she had not said "who" and that Julio said "I am the one." She said those statements were correct. Appellant then went on to tell in detail of the violence and cruelty of Joseph in the past, and particularly during the last two years.

Other witnesses testified to occasions when Patricia or appellant had talked of getting rid of Joseph or of killing him, others told of appellant's romance with Don Casillas. A Mrs. Rogers testified that a month before the murder appellant had said she would give a thousand dollars for someone to kill Joseph, and Patricia said she would do it for nothing. This witness said that they wanted her to start a fight with Joseph, so he could be killed and they could claim self-defense. A deputy matron who was guarding Patricia during the trial heard appellant say, "Well, I guess I did the family a favor when I got rid of him." When the witness protested to appellant, she said, "Well, its the truth."

Appellant at the trial denied that she had conspired with Julio and Patricia to murder Joseph. She claimed she had not taken their discussion seriously. She said she had lied

in giving the statement to the officers at Morgan Hill, but that she had done it to protect Julio.

She denied having made the statements wherein she admitted having conspired to murder her husband or claimed that she could not remember having made them. She denied having made the statements testified to by Mrs. Rogers, and denied having made the remarks testified to by the deputy matron.

Appellant herein does not contend that the evidence is insufficient to support the conviction, but bases her appeal entirely upon alleged errors in instructions. ■ The court told the jury that there had been evidence received of the prior acts and conduct of decedent and his relations with the defendants at other times, and then instructed them "that these matters were received solely for what weight they may have, if any, to indicate the state of mind of the various parties involved. They do not . . . afford any legal excuse or justification for the killing of Joe Grasso. There is no contention made here by any of the defendants, . . . that the killing of Joe Grasso was either excusable homicide or justifiable homicide. In an unlawful killing of a human being, the law has no concern whether the victim be a saint or a sinner."

Appellant says that evidence was introduced by the prosecution to show that Joseph Grasso was quarrelsome, combative and bloodthirsty. This evidence came in through the statements of defendants introduced by respondent. In addition, more evidence of Joseph's character for cruelty, violence and vile language came in through the testimony of Julio Grasso at the trial. Julio's theory at the trial negatived the theory that appellant had agreed to pay him to kill his father. He testified that he had been drinking heavily and that he quarrelled that night with his father after he argued with him about money, and his father called Julio and his wife vile names. He also stated that he paid no attention to the conversation of his mother and Patricia about killing his father, as that was just talk, that he had heard conversations since he was 5 years old in which people said that his father ought to be dead. Since the record shows that the parties constantly spoke of killing, appellant says the jury should have been allowed to consider the prior acts and conduct of the parties to show that that was merely the way they talked and lived. The instruction given, it is claimed, limited the consideration of such prior conduct to showing a reason for malice or ill will on the part of defendants.

Appellant admits that prior acts and conduct of a decedent and a defendant in a murder case are competent evidence to show malice and state of mind on the part of defendant. (*People* v. *DeMoss*, 4 Cal.2d 469, 474 [50 P.2d 1031].) The instruction as given states correct principles of law applicable to the case.

Appellant argues that the jury should have been permitted to consider the acts and conduct of Joseph Grasso in relation to the influence and atmosphere in which appellant was involved throughout her married life and her state of mind at the time she made statements concerning his death. She admits that the instruction would appear to allow the jury to consider the decedent's conduct for all purposes, even to show how they commonly acted toward one another, but contends that the reference to the fact that such conduct could not justify the homicide where there was no contention that it was excusable or justifiable, limited it to showing malice and ill will. Appellant's argument appears to concede that the instruction is legally correct, but that it should have expanded on the specific states of mind that could have been induced in appellant by decedent's conduct. Since the court correctly instructed on the general principle of law applicable, it was appellant's duty to request more specific instructions if she felt they were necessary to her theory of the case. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8].)

It is alleged that error was committed in an instruction concerned with the testimony given by a psychiatrist as to Julio Grasso's mental condition. The testimony of Dr. Pinto had been introduced to prove that Julio was not capable of making a reliable statement concerning the death of Joseph Grasso, because of his mental inadequacy. On cross-examination the doctor even stated that it was his opinion that Julio was insane. The judge instructed that Dr. Pinto's testimony was not received for the purpose of showing whether Julio was sane or insane at the time of the homicide, but could be considered "solely for whatever value you may give it with respect to the mental ability of Julio Grasso to form or entertain an intent, or to premeditate any crime charged against him herein. Otherwise you must follow my instruction that Julio Grasso is conclusively presumed to be sane." The court undoubtedly by this instruction excluded from the jury's consideration the uncontradicted evidence of Julio's poor mental condition in their determinations as to the weight of his statements and confessions. The jury at one time

returned for further instruction asking that Julio's last statement to the district attorney be reread to them.

It has been held that when evidence has been introduced that a confession was made by a person mentally incompetent, the jury should be permitted to consider such evidence under proper instructions. (*People* v. *Goold,* 215 Cal. 763, 765 [12 P.2d 958]; *People* v. *Lehew,* 209 Cal. 336, 342 [287 P. 337]; *People* v. *Boyington,* 3 Cal.App.2d 655, 658 [39 P.2d 867].) The attorney general does not defend the instruction but points out that Julio's admissions and confessions were not admissible against appellant, and the jury were so instructed. Regardless then, of error in the instruction affecting Julio, it was not prejudicial to Mary Grasso, the only appellant herein. To this appellant replies that a subsequent instruction told the jury that a statement or confession made by one defendant in the presence and hearing of another defendant and not disputed by him when given a reasonable opportunity to do so, is to be considered as applying to the cases of all such defendants. It would seem that what weight the jury would give to the statement made by Julio in Mary's presence, because of their knowledge of his mental condition, would not be significant in judging her conduct in relation to such statement. The criterion is her conduct in acknowledging the statement made as the truth, regardless of the capacity of the person making it. Appellant raises the question of her own mental adequacy at the time she gave her statements, calling attention to the testimony that she was under the influence of sedatives. However, the instruction above criticized, was confined entirely to evidence concerned with Julio's mental condition as testified to by Dr. Pinto. This instruction cannot, therefore, be held prejudicial to appellant.

The final instruction attacked by appellant is one relating to confessions and admissions. It reads as follows:

"Now, notwithstanding much that you have listened to here, and contrary to some rather widely spread notions, the law does not require that a defendant, at or before the time he makes a confession or admission or statement, be informed on his rights, or have his attorney present, or be free from arrest or restraint.

"It merely requires that any confession he may make, be made freely and voluntarily.

"It must not be obtained by any kind or degree of violence, or abuse or threat; or upon any implied or direct promise

of immunity, or leniency, reward or other benefit, or by any coaxing, cajoling or menacing conduct.

"A confession made while under arrest and being in custody, and when he is not represented by counsel, and when he hasn't been told that what he says may be used against him, may still be free and voluntary. These circumstances do not of themselves render the confession involuntary.

"Of course, you are the sole judges of the effect and weight of all evidence here produced, and it is for you to judge the character of such a confession, and the weight to be given."

The instruction given is a correct instruction on confessions and admissions. No principle of law has been incorrectly stated. Undoubtedly a more complete instruction could have been given. Apparently appellant requested no instructions upon the subject. If appellant wished to have a more complete instruction given, she should have requested it. In the absence of a request she cannot complain. (*People* v. *Bender,* 27 Cal.2d 164, 174 [163 P.2d 8]; *People* v. *Andary,* 120 Cal. App.2d 675 [261 P.2d 791].)

It is true that the jury must reject a confession completely if they find that it was not freely and voluntarily made. (*People* v. *Rucker,* 11 Cal.App.2d 609, 612 [54 P.2d 508].) Appellant argues that the jury was not here told that it must completely reject the confession if it made that finding. They were told that they were the sole judges as to the character of the confession, but it is argued that they might find it involuntary and under this instruction still believe that they would give some weight to it. In criminal cases the court must of its own motion, even in the absence of a request, instruct the jury charging them fully and fairly upon the applicable law. (*People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].) In the present case an instruction in regard to confessions is of considerable importance, since they furnish the most convincing evidence in this case of appellant's guilt. There is abundant evidence in the record of statements made at various times in the past by appellant expressing a wish that her husband was dead or that someone would kill him, but without the confessions these statements might be viewed by the jury as just so much talk when considered in connection with the atmosphere in which the parties lived. There is, of course, one very damaging admission made by appellant to the deputy matron at the jail, at a time when appellant was fully aware that she was on trial for murder. True, she denied having made it.

Appellant cites *People* v. *Baker*, 42 Cal.2d 550, 576 [268 P.2d 705], a case which was reversed because only partial instructions were given, and as given were erroneous. In the present case, the instruction was not erroneous, and while a fuller instruction might have been given, no amplification of the instruction was sought by appellant. In the case of *People* v. *Black*, 73 Cal.App. 13 [238 P. 374], cited by appellant, the appellant therein offered a correct instruction on confessions which was refused by the trial court, and the court further advised the jury that the question of whether a confession was free and voluntary was for the court to decide, and that that question had been disposed of. It has been held that a defendant who has not made a request for an instruction in regard to the right of the jury to redetermine the question of the voluntary character of a confession and reject it as evidence if their finding is adverse, cannot complain of prejudicial error in that regard. (*People* v. *Fowler*, 178 Cal. 657, 662 [174 P. 892] ; 8 Cal.Jur. 311-312, § 363.)

 Appellant cites as evidence that her confessions were involuntary, testimony that she was under sedatives at the time the statements were taken, that as a result she was upset and ''groggy,'' that the interrogators were telling her what she had done and that ''she didn't know what was going on.'' Her doctor testified that he had left sedatives for her to take when he was called by her in the early morning hours of January 12th, and Patricia Perry testified that appellant had taken two more of these pills later in the day. There was no testimony offered by appellant to show that the prosecution had used any type of threats, inducement or compulsion. Appellant does state that she testified that her statements were not free and voluntary. While that appears to be merely a conclusion, the transcript reference cited shows that that statement was made by Patricia Perry in regard to her own confessions, and was not made by appellant. Therefore, if there was any affirmative evidence of involuntariness, it must be based on her physical and mental condition resulting from strain and from the sedatives.

However, in a recent case (*People* v. *Cobb*, 45 Cal.2d 158 [287 P.2d 752]), wherein it was contended that the court committed prejudicial error in admitting a defendant's confession in evidence, the court stated: ''The evidence discloses that there was no force or violence used on defendant Ault, and that there were no promises of reward or immunity from

punishment, and that he spoke voluntarily. At the beginning of the interrogation Ault was asked how he felt and he answered that he felt better. Thus, *even though Ault may have been under the influence of a drug, may have received blood transfusions and may have been in poor physical condition* the confession was admissible, and these factors merely went to the weight to be attached to it.'' (Emphasis ours.) And in *People* v. *Rucker,* 11 Cal.App.2d 609, 612 [54 P.2d 508], a case in which the court had instructed the jury of their power to disregard the confession if they found it to be made by a person mentally incompetent, it was said, ''Moreover, any evidence tending to establish that the defendant was not in full possession of his faculties at the time he confessed his guilt would not affect the admissibility in evidence of the confession itself, but would be evidence to be considered by the jury in determining the weight or effect to be given to it.'' (And see *People* v. *Harrison,* 41 Cal.2d 216 [258 P.2d 1016]; *People* v. *Amaya,* 40 Cal.2d 70-77 [251 P.2d 324]; *People* v. *Lehew,* 209 Cal. 336, 340-341 [287 P. 337]; *People* v. *Miller,* 135 Cal. 69, 71-72 [67 P. 12]; *People* v. *Duncan,* 72 Cal.App.2d 247, 251-253 [164 P.2d 313].)

Upon a review of the entire record we find no prejudicial errors. The jury was fully and fairly instructed and the evidence is ample to sustain the conviction. On this state of the record we must affirm the judgment.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.