[Crim. No. 3258. First Dist., Div. One. Mar. 19, 1957.]

THE PEOPLE, Respondent, v. AUSTIN HECKFORD, Appellant.

Donald M. Haet and Cole Blease for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was tried by a jury on two counts of burglary (1) at the Sea Gull Tavern, (2) at the Red Mill Tavern. He was acquitted on the second count and found guilty of second degree burglary on the first count. He appeals from the judgment of conviction thereon and from the denial of his motion for new trial.

## QUESTIONS PRESENTED

Defendant concedes that the evidence is sufficient to support the conviction. He contends that this is a very close case depending upon circumstantial evidence, possession of stolen goods, and defendant's credibility or lack of it concerning his explanation of that possession. Therefore, he says, alleged error in permitting cross-examination of himself as to why he lost his job was highly prejudicial.

## EVIDENCE

August 2, 1955, between 2:30 and 7 a. m. the Red Mill Tavern was burglarized, apparently by entry gained by knocking in a side door. The contents of the coin boxes of the juke box, cigarette and pinball machines were taken, plus a radio, the cord of which apparently broke in the taking. Defendant, his wife and child lived in a cottage at the rear of this tavern.

September 14, the Sea Gull Tavern located a few doors away, was burglarized between 2:30 and 8:30 a. m., entry being gained through a side window which was pried open by some type of prybar. Contents of the coin boxes of the juke box, cigarette and pinball machines were taken. Among other things taken were some 45 R.P.M. records, six bottles of liquor, a hammer, a hatchet and nine beer glasses.

Several weeks later defendant, Winsett and another entered the Sea Gull and played the pinball machine. Risinger, the proprietor, noticed that they were not playing it very much. He thought that something was a "little strange." He requested them to leave. He then noticed that the coin box on the machine had been pried but nothing was taken. Also someone had tried to force open the boards nailed over the window in the men's room. He was not sure that defendant had been in that room, although Winsett had. Risinger did not see defendant do either thing, but was suspicious of defendant, and after acquiring defendant's identity and address informed Police Inspector Barden. On October 8th, Barden saw defendant and his wife in the Red Mill, told them that he would like to talk to defendant about the recent burglaries. The three plus defendant's brother-in-law went to defendant's cottage. There there was a stock of liquor which defendant claimed to have bought in several San Francisco places. Risinger came over to the cottage and identified some of the bottles as stolen from his tavern on September 14th. One was a rare type of Philippine rum, bearing a serial number corresponding to that of one purchased some time prior. Other bottles were identified by the peculiar pouring spouts thereon. Five beer glasses were identified as similar to the stolen glasses. Although Risinger could not positively identify the records found in defendant's cottage, they were of the same speed, songs and performers as those taken. Defendant, both before Risinger arrived and after Risinger identified the bottles and glasses as above stated, claimed to have brought the beer glasses when some time prior he had moved from Sharp Park, and to have bought the liquor downtown. Defendant claimed that he had bought all the records, some of them from Winsett. Winsett testified he had sold defendant some records. Defendant's wife testified to the same effect.

Barden indicated that he was not satisfied with defendant's explanation of possession and that he was going to arrest defendant. Defendant then changed his story. He said that on the morning of September 14 (the date of the Sea Gull burglary) he was troubled with a toothache and went to the kitchen to rinse his teeth. Hearing a noise like glass breaking coming from the lot between the Red Mill and the Sea Gull he went outside to investigate. From the gate in the fence at the back of the lot, he could see the side of the Sea Gull which was lit by the headlights of a municipal bus parked in the terminal for the Judah Street line. The side window

of the tavern was partially open and just below on a ledge there seemed to be glasses. Defendant went over and found four bottles of liquor and five beer glasses which he brought home. A radio and its broken cord which Barden found in defendant's cottage was identified by De Marchi, the proprietor of the Red Mill, as the one stolen from that tavern on August 2d. Defendant told Inspector Barden that about the beginning of August, Winsett phoned him saying there was a present for him near defendant's garbage can. There defendant found the radio. Defendant's wife confirmed this story, saying she was the one who first answered Winsett's call. Winsett denied making the call or leaving the radio.

On October 8th Barden looked in the trunk of defendant's car, seeing a hammer and hatchet there. The following day defendant agreed to a search of the car and opened it. Barden asked defendant where he got "those," referring to the hammer and hatchet. There were other tools in the car. Defendant claims that in answering that they were his, he understood Barden to refer to the tools generally. The hammer and hatchet were identified by Risinger as those stolen from his place. Defendant thereafter said these tools were not there previously and that Winsett must have put them there. Defendant claimed that he loaned his car to Winsett about the date of the Sea Gull burglary. His wife testified that it was after that date. Winsett testified that defendant loaned him one of his cars after that date but that it was a Mercury. The hammer and hatchet were found in defendant's Dodge. Winsett admitted defendant had loaned the Dodge to him on occasion, but denied putting the tools in it.

At the trial Barden testified to an experiment. A municipal bus placed where defendant claimed the bus was which lighted the side of the Sea Gull, flashed it lights on the side of the building. Standing where defendant claimed to have stood, Barden could not see the ledge beneath the side window nor a bottle which he had placed there. Moreover the lower part of the window was in the dark. One Austin testified for defendant that he had made the same test on three separate nights and he was able to see the window and bottles on the ledge. Austin testified the distance from the bus terminal to the tavern was 140 feet; Barden testified it was 200 feet.

CROSS-EXAMINATION

On direct examination defendant testified that he had been working since he was 17, and that he had been working for Standard Oil from March, 1955, "until just recently."

This, of course, covered the period of the two burglaries. On cross-examination, over objection, defendant was asked if he was presently working for Standard Oil. He said he was not. Then without objection he was asked if he was working for anybody at the present time. He said he was not. Later, without objection, he was asked if he owned any prybars or had two in his possession on January 26th. He answered "no." On redirect his counsel asked him when he last worked for Standard Oil. He stated up to about "four days ago." His counsel asked him "And is it true that you lost your job because of this trouble?" He replied, "That's correct." He was then asked if he had worked steadily for them including the months of August and September, earning a weekly salary. He said that he had. On recross-examination the following occurred: "Q. Mr. Heckford, you said you were released from the Standard Oil Company job on account of this trouble. A. That is correct. Q. You were released from the Standard Oil Company job because you were arrested last Saturday night in possession of two prybars in front of the Sea Gull Tavern. A. I was not. Mr. Haet [counsel for defendant]: I will object to the question on the grounds it is prejudicial and has no materiality in this case. The Court: Overruled. The Witness: I was not in possession of prybars, whatsoever, no. The Court: You were not asked—he didn't ask you whether you were in possession of the prybars. He asked you if that was the reason why you were dismissed. The Witness: Yes. The Court: Because it was alleged that you had these in your possession, that is the question, I take it. The Witness: Dismissed from my job because I—— Mr. Campbell [assistant district attorney]: Q. I say, the reason you were dismissed from your job was because you were arrested Saturday night in front of the Sea Gull Tavern—— we will stop it right there. A. Yes." Defendant's attorney then asked defendant whether the car he was in at this time was Winsett's car and was directly across the street from the Red Mill which is in front of his home. The court then sustained an objection to a question asking ". . . what were you doing at the time?" on the ground that they were not concerned with the circumstances of the arrest as the court had permitted the evidence on the question of the reason for his dismissal because defendant had stated that he was dismissed because of the present charge and that the evidence went to his credibility. The court then instructed the jury, at some length, that it was not to draw any implication that

the defendant had committed any offense that night, that the question was asked merely as to the reason why his employment had been terminated. The court permitted the witness to testify that there were no prybars in the car on this occasion, and as to the reason he lost his job. He stated that he had not shown up for work on Sunday or explained his absence, ''and it had been investigated right away and evidently they had found out what had happened . . .'' Why defendant lost his job was a purely immaterial matter. The prosecution would not in the first instance have been permitted to prove it. The fact that defendant without any objection by the plaintiff gave a reason did not open the door for cross-examination on the subject. ■ '' '. . . Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony.' (*People* v. *McDaniel* (1943), 59 Cal.App.2d 672, 677 [140 P.2d 88].) ■ Neither is it within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case.'' (*People* v. *Wells*, 33 Cal.2d 330, 340 [202 P.2d 53].) ■ Examining defendant as to whether he owned or had prybars in his possession was proper in view of the way in which the Sea Gull had been entered. In his opening brief defendant states that at the time in question, defendant was in another's car in which there were two prybars. Defendant testified without objection that he did not know there were prybars in the car. However, attempting to tie possession in with the subsequent arrest was highly improper. The fact of that arrest was not admissible by itself nor could it be brought in on the theory that it was being used to test defendant's credibility.

■ The question then arises as to whether the above mentioned error was prejudicial. (See Const., art. VI, § 4½; Pen.Code, §§ 1258, 1404.) In view of all the circumstances of the case it does not seem reasonable that the jury would not have convicted defendant without the reference to the second arrest. The fact of defendant's possession of property stolen in the burglaries, coupled with his contradictory stories and his evasiveness, leave room for no doubt of his guilt. In spite of the apparent conflict between the testimony of Winsett and that of defendant and his wife, we agree with the statement of the trial court on the hearing of the motion for new trial

that this was not a close case, and that as to defendant's story that what really happened the night of the Sea Gull burglary was that defendant had frightened away the real burglar who had then returned and hidden the hammer and hatchet in defendant's car to point the finger of suspicion at defendant, it is fantastic. The combination of a toothache, the sound of breaking glass, the illumination by the bus lights, the open window and the objects on the ledge required too many convenient incidents not to have been fabricated. The mention of the subsequent arrest could have been only a drop in a full pail of water. (See *People* v. *Watson*, 113 Cal.App.2d 799, 803 [249 P.2d 38] ; *People* v. *Flores*, 113 Cal.App.2d 813, 821 [249 P.2d 66].)

 Risinger's testimony as to the circumstances of the latter visit of defendant, Winsett and another to the tavern when the juke machine coin box was found pried open, and an attempt had been made to pry the boards in the men's room, was admissible as helping to disclose a common plan or scheme. (See *People* v. *Grimes*, 113 Cal.App.2d 365 [248 P.2d 130].)

The fact that the jury acquitted defendant of the Red Mill burglary in nowise indicates that the case was a close one, As the trial court stated, the jury was ''magnanimous.''

Judgment and order affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 8, 1957, and appellant's petition for a hearing by the Supreme Court was denied May 15, 1957.