[Crim. No. 6833. In Bank. Nov. 2, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. HENRY RAY LANE, JR., Defendant and Appellant.

Dennis L. Woodman, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and John S. McInerney, Deputy Attorneys General, for Plaintiff and Respondent.

DOOLING, J.—Defendant was charged with the murder of John Lyle. He entered a plea of not guilty. A jury found him guilty of murder of the first degree and fixed the penalty at death. The trial court denied defendant's motion for a new trial and sentenced him to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

About 2:30 p. m. on September 22, 1960, defendant and one Ralph Ruiz picked up defendant's truck at a Redwood

City garage where defendant had left it for repairs. They had driven that day from their homes in Stockton in a car temporarily loaned to defendant by the garage owner. Upon picking up the truck, defendant transferred from the loaned car to the truck a brief case, hat and jacket. About an hour later the two men drove into a shopping center parking lot in Hillsdale, where they stole a red Ford Thunderbird. Defendant drove the Thunderbird, and Ruiz followed in the truck, to the Stanford Shopping Center. They parked the cars there, and after some discussion, both got into the Thunderbird. Defendant drove around the area looking, according to defendant's later statements to the police, for a possible place to rob but not finding any, they decided to go elsewhere. They returned to the parking stall where they had left the truck; defendant continued driving the Thunderbird and Ruiz got into the truck to follow. They drove northerly on El Camino Real and turned into the parking lot at Draeger's Market in Menlo Park.

Meanwhile the owner of the Thunderbird had discovered the theft and reported it to the police. Officer John Lyle, a Menlo Park patrol officer, heard the police radio broadcast of the theft, saw defendant on the road in the stolen car, and as defendant turned into the market's parking lot and parked the Thunderbird, Lyle followed defendant, parking his police squad car directly behind defendant so as to block any attempted escape. Lyle got out of his patrol car and approached defendant sitting in the Thunderbird. It was then about 4:30 p. m., the parking lot was fairly crowded, and a number of persons witnessed the ensuing events.

According to the accounts given at the trial, Officer Lyle had his gun drawn at the time he walked toward defendant sitting in the Thunderbird and he was heard to order defendant to "get out." Immediately thereafter there was a fusillade of bullets. Who fired first was a main point of contention in the case: it was the prosecution's claim that defendant opened fire on Lyle with a .45 caliber pistol that defendant had concealed under a jacket on his lap, while the defense claimed that Lyle shot first and defendant fired back in panic. Apparently defendant emptied his .45 automatic shooting in the direction of Lyle, wounding and causing him to fall to the ground. Defendant then grabbed a fully loaded P-38 pistol that he was also carrying in the front seat and as he stepped out of the Thunderbird, he aimed the pistol at Lyle, having cocked it with the prosthesis he wore in place

of his left hand. The pistol jammed; two shots were fired in the air; and then defendant stood over Lyle and fired several shots directly into the body of Lyle. The pistol jammed again and defendant started running from the scene. After going a short distance, defendant returned to the Thunderbird, grabbed his jacket from the front seat and draped it over his artificial hand and arm. He then ran across the parking lot, dropping one of the guns there and the other at the back entrance of the market.

Meanwhile Officer Donohue, responding to Officer Lyle's previous radio call for help, reached the parking lot, heard some of the shooting, saw what was happening; and after parking his patrol car, Donohue set out on foot in pursuit of defendant. Donohue chased defendant through the market and out into the street where he finally overtook defendant. Two other officers then arrived on the scene and while defendant was being handcuffed, one of the officers asked defendant why he had shot Officer Lyle, to which defendant responded: "I got him. I am glad I got him." The officers searched defendant at the time of his arrest and found in his pockets a large quantity of ammunition for the two pistols defendant had been carrying.

A doctor in the vicinity had been summoned for the wounded Lyle but by the time he arrived, Lyle was dead. The autopsy performed later that day showed that Lyle had been shot four times—once in the back of the head and three times in the abdomen—and that Lyle died from his wounds. Defendant also was hurt in the gunplay with Lyle, suffering bullet wounds in both legs just below the kneecaps, and he was taken to the hospital for treatment, where he remained nine days, until October 1.

At the trial it appeared that four days before the Lyle episode defendant and Ruiz had entered a candy store in Walnut Creek and committed an armed robbery. The victim, who had come into the store while the robbery was in progress, testified that defendant accosted him with gun in hand and took his wallet containing about $50; that when he saw defendant's picture in the newspaper in connection with the Lyle homicide, he recognized defendant as his assailant in the robbery, and so reported to the police who were then still trying to solve that crime.

After his apprehension defendant made seven statements to the police, each time giving a little more detail about the Lyle homicide but never admitting either that he intended

to commit a robbery when he pulled into the parking lot at Draeger's Market or that he had fired *first* at Officer Lyle. The first statement was taken at the Menlo Park Police Station, where defendant was taken shortly after his arrest on September 22 and examined by a doctor before being transported to the hospital. In that statement defendant admitted the theft of the Thunderbird and driving it to Draeger's Market. He then related the officer's (Lyle's) parking his patrol car behind him so as to cut off any attempt at escape; the officer's subsequent approach with a drawn gun when "they both started shooting" but defendant insisted that the officer opened fire first. Defendant claimed that he was alone at the time, and stated that on September 22 he had walked from his home in Stockton to Hillsdale, where he stole the Thunderbird.

Defendant was then taken to the hospital and while so confined he gave four more statements to the police: two on September 23, one on September 28, and one on September 30. In each of these statements defendant's basic contentions remained the same: that the officer (Lyle) opened fire first and he, defendant, returned the gunfire more or less in panic. However, defendant did admit that as the officer approached him in the parking lot, he was aware that he was driving a stolen vehicle and was in illegal possession of firearms. Defendant denied any recollection of having shot the officer as the latter lay wounded on the ground. In answer to a query about his pickup truck, defendant admitted owning one but claimed that he had left it in Stockton and had not used it in the September 22d affair then under investigation. Defendant still insisted that he was acting alone at the time. In one of the statements he admitted commission of the Walnut Creek robbery.

Defendant gave a sixth statement in the district attorney's office on October 1 after his release from the hospital. He therein admitted that he had a companion, Ruiz, with him on September 22; that they had driven that day together from Stockton to the Redwood City garage where defendant's truck was being repaired; that after he, defendant, had stolen the Thunderbird from the Hillsdale parking lot, he drove to the Stanford Shopping Center, with Ruiz following in the truck; that after parking the Thunderbird and the truck, he and Ruiz talked together about finding a suitable place to rob. However, defendant further claimed that after surveying the situation at the Stanford Shopping Center, they decided

against committing a robbery there; that while they then thought they would look elsewhere for a place to rob, defendant changed his mind as he was driving to Menlo Park, with Ruiz following in the truck, and when he, defendant, pulled into the parking lot at Draeger's Market, he had abandoned all robbery plans and then merely intended to leave the Thunderbird there so as to be rid of it, although he had not yet communicated this change of plans to Ruiz. Defendant further claimed that he was so confused when the officer (Lyle) came toward him in the parking lot that he did not realize what was happening as the interchange of gunshots took place.

Defendant gave his seventh and last statement to the police on October 3 in a police car. At this time defendant directed the accompanying officers over the route that he and Ruiz had followed on September 22, pointing out the Hillsdale parking lot where he had stolen the Thunderbird, the various places he and Ruiz had considered robbing in the Stanford Shopping Center, and finally the scene of the homicide on the parking lot of Draeger's Market, Menlo Park, and the chase through the market until defendant was apprehended.

Defendant did not take the stand on the trial as to his guilt, but in his argument to the jury defendant's counsel referred to portions of defendant's several statements which were favorable to his theories of defense.

We shall separately state and consider the points argued by defendant as stated by defendant's counsel in his brief filed herein.

1. *Defendant's constitutional rights were violated by being held in custody in excess of 48 hours before being taken before a magistrate, in violation of section 825, Penal Code.*[1]

Admittedly defendant was not taken for arraignment until September 29, seven days after his arrest; but defendant was hospitalized for treatment of his leg wounds suffered in the gunfire at the time of Officer Lyle's homicide, and it was only in the evening of September 28 that Inspector Kieler was advised by the hospital authorities that defendant was well enough to be taken to court for arraignment. The next morning, September 29, defendant was taken to court for arraignment, booked into the county jail, and then returned to the

---

[1] "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his. arrest, excluding Sundays and holidays. . . ." (Pen. Code, § 825.)

hospital to stay two more days before being released into the custody of the sheriff.

Obviously this delay was not due to police indifference nor to any attempt to hold defendant incommunicado from his friends and counsel. The evidence produced by the prosecution established that as soon as practicable after the hospital authorities had advised that defendant was well enough for the purpose he was taken before a magistrate and defendant did not attempt by cross-examination or the production of other evidence to controvert this. It would be an unreasonable application of section 825 to require a hospitalized defendant to be taken before a magistrate until it was possible to do so without jeopardy to his health. ■ In any event no prejudice to defendant is pointed out by the delay in his arraignment, and "[a] violation of a defendant's right to be taken before a magistrate within the time specified by the law does not require a reversal unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof." (*People* v. *Combes, ante*, pp. 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4].)

■ The testimony that defendant's several statements made in the hospital were freely and voluntarily given was in no way controverted nor was any objection made to their admission into evidence on the ground of the delay in defendant's arraignment. One statement was given immediately after his arrest and the last two following his arraignment. While unreasonable delay in arraignment may be a factor to be considered in determining whether a statement of a defendant is voluntarily made (*People* v. *Kendrick, ante*, pp. 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13]), there is no showing here, nor was any such claim made in the trial court, that the delay in arraignment in this case influenced any of the statements made by defendant. The mere delay in arraignment under these circumstances did not render the statements inadmissible. (*Crooker* v. *California*, 357 U.S. 433, 437 [78 S.Ct. 1287, 2 L.Ed.2d 1448]; *People* v. *Bashor*, 48 Cal. 2d 763, 765 [312 P.2d 255].)

■ 2. *Statements were introduced in evidence that had been taken from defendant while under the influence of drugs, narcotics and hypnotics.*

This contention, like the previous one, was not urged in the trial court but is raised for the first time on appeal. As a witness for the prosecution, the attending doctor described defendant's wounds and treatment in the hospital. On cross-

examination, he stated that during the hospitalization certain drugs were prescribed for defendant, but the doctor was not questioned as to the quantities administered to defendant, the dates the drugs were given to defendant nor as to their effect upon him, except that the morphine sulphate given was "a pain killer." In these circumstances there is no evidence that defendant was under the influence of drugs when he gave any of his statements, and defendant may not predicate an argument on such ground on appeal when no proper foundation for such claim was laid in the trial court.

The prosecution agrees that the fact of "heavy sedation or drugs" at the time a statement is taken from a suspect would be a circumstance for the jury to consider in determining its voluntary nature. (*People* v. *Cobb*, 45 Cal.2d 158, 162 [287 P.2d 752]; *People* v. *Grasso*, 142 Cal.App.2d 407, 417-418 [298 P.2d 131]; see also *People* v. *Waack*, 100 Cal. App.2d 253, 257 [223 P.2d 486].) But where there is no evidence indicating any improper conduct in procurement of the statements so as to constitute a denial of due process and no attempt was made in the trial court to substantiate defendant's present challenge of the voluntary character of these statements, defendant cannot prevail in such claim now. (*People* v. *Millum*, 42 Cal.2d 524, 526-527 [267 P.2d 1039].)

■ 3. *The trial court erred in refusing the offers of proof of defendant in regard to evidence concerning the Mitchell matter.*

Defendant argues that since "part of the (prosecution's) case in chief . . . touched upon the Mitchell matter," he should have been allowed to have "inquired" into the "whole" of it. (Code Civ. Proc., § 1854.) In the course of Inspector Kieler's testimony as to the statement he took from defendant on October 1, it appeared that Kieler had then asked defendant how he knew about a certain "shooting match," a matter he and defendant had discussed a few days previously. In the course of his statement defendant apparently gave a rather evasive answer but he did say that he knew that Officer Lyle had been involved in it. Upon cross-examination, Kieler was queried about this matter. The prosecution immediately objected, urging that the cross-examination should be limited to statements between Kieler and defendant. The defense argued that the prosecution had opened the door to query on the matter by introducing the statement containing the cited reference. The court finally permitted further query of Kieler as to whether the reference was to "the killing of a citizen

in his own home . . . by Officer Lyle" and Kieler replied "Yes." After further argument between counsel, the defense was allowed to develop the matter to show that the man slain was a Mr. Mitchell, that Kieler had visited the Mitchell home after the shooting and while Officer Lyle was still there, and had seen Lyle's gun in his holster, and that Mitchell was found with "five bullet wounds in (his) body." It was then shown that Officer Lyle had gone to the Mitchell house on official business, that he was called by Mrs. Mitchell, and that Mitchell was shot in the course of the visit. Thereupon the defense attempted to introduce a report from the official police records; the prosecution objected and in an offer of proof to the court, without the presence of the jury, the defense cited a statement of Mrs. Mitchell in the case record to the effect that as Officer Lyle entered the house, her husband had a knife in his hand and had started arguing with Lyle; that Lyle told her husband to put down the knife but he would not; that her husband then overturned a table and Lyle pulled out his gun and started shooting; that her husband had not made any move toward Lyle at the time. The court finally ruled that no further questioning on the "Mitchell matter or any other matters concerning the conduct of Officer Lyle (relating) to the handling of a gun" would be allowed, in sustaining the prosecution's objection that such evidence was not relevant or material. It is clear that the record of Mrs. Mitchell's statements was hearsay and inadmissible on that ground, even though the report may have qualified as a business record under Code of Civil Procedure, section 1953f. (*Behr* v. *County of Santa Cruz*, 172 Cal.App.2d 697, 704-706 [342 P.2d 987] ; *Hoel* v. *City of Los Angeles*, 136 Cal.App.2d 295, 309-310 [288 P.2d 989].)

It also appears that defendant had no knowledge of this incident at the time of his encounter with Officer Lyle. In the absence of such knowledge at the time of the killing no basis for its admissibility is suggested. (*People* v. *Hoffman*, 195 Cal. 295, 310-311 [232 P. 974].) ▮ Defendant is not entitled to inquire into collateral matters not otherwise relevant or admissible because they have been incidentally touched upon in the testimony. (*People* v. *Heckford*, 149 Cal. App.2d 250, 255 [308 P.2d 497] ; *People* v. *McDaniel*, 59 Cal. App.2d 672, 677 [140 P.2d 88].)

4. *The court erred in instructing on armed robbery or attempted armed robbery.*

The court instructed that a homicide committed in the

perpetration or attempt to perpetrate robbery is murder of the first degree.

Defendant concedes that the instructions were correct as stating abstract rules of law but argues that they were not responsive to any issue in the case because no evidence was introduced showing that defendant and Ruiz were attempting a robbery and were thwarted by Officer Lyle's intervention. The prosecution relies on (1) circumstantial evidence surrounding the happening of the homicide—the guns defendant was carrying, the additional rifle and ammunition in the pickup truck that Ruiz was driving; and (2) defendant's admission in his various statements that he and Ruiz were planning a robbery that afternoon but had not found a suitable place to rob. The only contrary evidence was defendant's further claim in his statements to the police that he had abandoned the robbery plan after leaving the Stanford Shopping Center where he and Ruiz had ''cased'' the area looking for a place to rob, and then he was only interested ''in getting rid'' of the stolen Thunderbird by leaving it in the parking lot where the homicide subsequently occurred. Defendant admitted that he had not told Ruiz of this change in his robbery plans. ■ The prosecution is not bound by all of defendant's declarations in his statements or confessions to the police negating criminality when there is other evidence tending to prove criminality, and it is ''the function of the trier of fact to determine which version is to be believed.'' (*People* v. *Acosta*, 45 Cal.2d 538, 542 [290 P.2d 1]; *People* v. *Fulton*, 188 Cal.App.2d 105, 116 [10 Cal.Rptr. 319]; see also *People* v. *Johnston*, 48 Cal.2d 78, 83 [307 P.2d 921].) There was sufficient evidence to support a finding that the killing was committed while defendant was attempting to commit a robbery despite his statements to the contrary.

■ The district attorney in his argument referred, without objection, to the prosecution's robbery theory and the felony doctrine in connection with the commission of a homicide; defendant's counsel replied by discounting the robbery claim; and in the related instructions submitted by defendant and given, there was included a recital of the elements or acts necessary to constitute an attempt to commit a crime and the circumstances required to establish an abandonment. Under the evidence the instructions on the robbery issue were properly submitted to the jury in determining defendant's guilt.

■ 5. *Any items removed from defendant's truck were*

*not required to the proof of the People's case, and the admission thereof was prejudicial.*[2]

A search of defendant's abandoned truck which was being driven by Ruiz at the time of the homicide uncovered some guns and ammunition. These items were introduced in evidence over defendant's objection that they had been seized during an "unlawful search and seizure." After a hearing on this point, the court overruled defendant's objection in acceptance of the prosecution's theory that defendant and Ruiz were so fully armed because of their robbery plans. Defendant argues that since the guns that were used in the Lyle homicide by defendant were absolutely identified at the trial, the other weapons and items found in the abandoned truck miles from the scene of the homicide were not relevant, and that the only purpose of their introduction was to try to establish that defendant was the "sort of person who carries deadly weapons." (*People* v. *Riser,* 47 Cal.2d 566, 577 [305 P.2d 1].)

The weapons were of a character which could be used in armed robbery, in which defendant and Ruiz had agreed to engage, and were found in the truck used in furtherance of the criminal plan. Their circumstantial relevancy therefore seems clear. ▮ In any event the only objection voiced at the trial was the claim of unlawful search and seizure. That ground is not urged on appeal and in view of the fact that Ruiz, defendant's confederate who was driving the truck in furtherance of their criminal plan, led the officers to the truck and identified the truck to them, it is not tenable. ▮ Defendant cannot for the first time urge on appeal a different objection to the evidence not voiced in the trial court. (*People* v. *Witt,* 159 Cal.App.2d 492, 497 [324 P.2d 79].)

▮ 6. *The court erred in denying defendant's motion for the production of statements of named witnesses.*

A few weeks before the scheduled trial date, defendant made a motion requesting the court to order the prosecution to furnish him with copies of statements from 13 named individuals (allegedly eyewitnesses to the homicide) and certain other items of evidence in the possession of the prosecution. The motion was granted as to the "other items of evidence" and a decision on the requested statements was continued

---

[2]The order of presentation of appellant's points in his brief is departed from with this specification so as to consider all arguments directed to the trial on the issue of guilt before considering the specifications directed to the trial on the issue of penalty.

for two days. Upon later consideration of the matter, the court gave defendant permission to examine the statement of one of the 13 persons named by defendant and denied the request as to the others "without prejudice of defendant to make any further motions." The record does not show that defendant at any time made a further motion for discovery of any of these statements although the trial court had expressly left the way open for him to do so. Only three of the named persons whose statements were demanded were called by the prosecution as witnesses, and defendant was furnished copies of the statements of all three. The names of all were known to defendant and the record is silent as to whether he interviewed or attempted to interview any or all of them. "Although the defendant does not have to show . . . that the evidence which he seeks to have produced would be admissible at the trial [citations], he does have to show some better cause for inspection than a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime." (*People* v. *Cooper*, 53 Cal.2d 755, 770 [3 Cal.Rptr. 148, 349 P.2d 964].) On the showing in this record neither error nor prejudice appears.

 7. *The court erred in excluding evidence in regard to the death penalty being a deterrence to crime.*

8. *The court erred in instructing on the death penalty being a deterrence to crime.*

On the trial to determine the penalty defendant sought to produce a prison chaplain to testify to his opinion that the death penalty is not a deterrent of crime. The court properly excluded this evidence. (*People* v. *Love, ante,* p. 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

 The court correctly instructed the jury that the fixing of the penalty at death or life imprisonment was in their "absolute discretion," that "there is no rule of law which suggests that the punishment should be death unless there is evidence of extenuating or mitigating circumstances nor does the law suggest that the penalty shall be life imprisonment unless there is evidence in aggravation of the offense."

The court further instructed: "In deciding the question whether the accused should be put to death or sentenced to imprisonment for life, it is within your discretion alone for you to determine, each for yourself, how far you will accord weight to the consideration of the several objectives of punishment, *of the deterrence of crime,* of the protection of society, of the desirability of stern retribution; or of sympathy, as well as revulsion against the defendant for his

crimes, or clemency, of age, as well as experience, sex, human passion, as well as ability to carefully deliberate and plan, ignorance, as well as experience, or weakness, as well as strength, or of the presumptions concerning, or possible uncertainties attaching to, life imprisonment, or of the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light as well as the definiteness and certainty of the evidence before you, or any other consideration whatever which appears to you to be important in the light of the evidence, the duty you owe to the accused and to the State, and the law as I explained it to you.'' (Emphasis added.)

We said in *People* v. *Love, supra,* page 731: ''The Legislature has left to the absolute discretion of the jury the fixing of the punishment for first degree murder. [Citations.] There is thus no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment. Since evidence on this question is inadmissible, argument thereon by prosecution or defense could serve no useful purpose, is apt to be misleading, and is therefore improper.'' The same reasoning leads to the conclusion that an instruction on the subject ''could serve no useful purpose, is apt to be misleading, and is therefore improper.''

The sole mention of deterrence of crime in the court's instructions is in the words emphasized in the quoted instruction: ''of the deterrence of crime.'' The words appear in a long enumeration of many factors which the jury may take into consideration in fixing the penalty; they do not suggest any opinion of the court that one penalty is a greater deterrent than the other; and while they should have been omitted, we do not believe that this single casual reference to ''deterrence of crime'' was prejudicial to defendant.

The same observation applies to the argument of the district attorney. While he did make some reference at one point to the possible deterrent effect of the death penalty, it was not a major part of his argument, as in *People* v. *Love, supra,* nor did it embody any of the aggravated features of the argument which we found prejudicial in that case. On the whole case we are satisfied that the defendant was not prejudiced by either instruction or argument on this point.

9. *The court erred in allowing the district attorney to cross-examine and introduce case histories of specific lifers first.*

After the administrative officer for the California Adult Authority had testified for the People generally as to the parole practices of the Authority in the cases of prisoners convicted of first degree murder and sentenced to life imprisonment, on cross-examination he was asked about the particular case of one prisoner convicted of first degree murder in San Mateo County about 1923 and sentenced to life imprisonment. The district attorney objected to "getting into specific individuals . . . unless I have the same opportunity." Over this objection the witness testified that this prisoner had been in prison "[s]ince he was committed from San Mateo County." On redirect the district attorney was permitted to inquire about one other case of first degree murder with a life term sentence over the objection ". . . I know that the defense has gone into a particular case, but on a collateral matter, not on the question of merits of any individual case. I would object to going into the merits of any particular case by name." The court stated: "I think you are limited to the procedure in the case, are you not . . . ?"; to which the district attorney replied: "Just asking for particular incidents involving first degree life imprisonment cases." The witness then testified that this prisoner escaped, was recommitted, was paroled, violated parole and was reimprisoned, was then reparoled and was still on parole. Defendant having introduced the evidence of one specific case in which a defendant sentenced to life imprisonment was still in prison after almost 40 years, is in no position to complain about this evidence of one other prisoner sentenced to a life term whose treatment was more lenient. If it was error to go into the facts of a particular case, and it would seem better practice not to do so, defendant opened the door in this instance, and we can find no prejudice in counterbalancing the general facts of one case produced by the defense by the general facts of another single case produced by the prosecution.

10. *The comment of the district attorney during argument was prejudicial misconduct.*

Defendant complains in this specification of the district attorney's references in his argument to "an army of criminals" and to "two armies fighting each other," referring to the criminal element and the law-enforcement officers as opposing armies. The figurative characterization of the activities of law-enforcement agencies as the "war on crime" is a commonplace of our everyday language and the district attorney's drawing upon this prevailing figure of speech to

illustrate and emphasize his argument cannot under the circumstances be regarded as inflammatory or improper. (See 48 Cal.Jur.2d, Trial, § 434, pp. 440-441.)

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

Schauer, J., and McComb, J., concurred in the judgment.