[Crim. No. 6545.   In Bank.   Mar. 4, 1960.]

## THE PEOPLE, Respondent, v. RICHARD THOMAS COOPER, Appellant.

Edward T. Mancuso, Public Defender (San Francisco), and Claude D. Perasso, Deputy Public Defender, for Appellant.

Stanley Mosk, Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant was charged with (count 1) murder of Earlean Mosley committed on or about June 4, 1959, and (count 2) murder of Elvira Hay committed on or about August 3, 1958. As to each count he pleaded not guilty and not guilty by reason of insanity, and a jury found him guilty of murder of the first degree, fixed the penalty at death, and found that defendant was sane at the time the offense was committed. Defendant's motion for new trial was denied. This appeal (pursuant to Pen. Code, § 1239, subd. (b)) is from the order denying a new trial and the ensuing judgment which imposes two sentences of death.

. Defendant urges that as a matter of law the murders were of the second degree only, and that the giving of instructions as to murder in the perpetration of or attempt to perpetrate rape was prejudicial error because there was insufficient evidence to justify instructions on that subject. Both these contentions rest upon defendant's view that the "corpus delicti" of *first degree* murder (on the facts here, either a wilful, deliberate, and premeditated intent to kill, or the elements of rape or attempted rape), and not merely the death of the victims by criminal agency, must be proved by evidence other than extrajudicial statements of the defendant. Defendant further contends that the trial judge erred to his prejudice by refusing to order the People to furnish defense counsel, prior to trial, with copies of statements of seven persons assertedly obtained by the People in their investigation of the killing of Elvira Hay. The judge in connection with such ruling stated that if the prosecuting attorney should call such persons as witnesses the judge would require him to furnish defense counsel with copies of their statements and would allow "ample time" for defense counsel to study them in preparation for cross-examination. The position of defense counsel, however, is that whether or not the prosecution called such persons as witnesses defendant had the right to examine their statements in advance of trial so that he would have opportunity to prepare his case. We have concluded that defendant's contentions cannot be sustained, that defendant was accorded a fair trial on all issues, and that the order and judgment from which this appeal is taken should be affirmed.

Apart from defendant's extrajudicial statements there is evidence of the following facts: At the times of the killings defendant resided in a hotel at 293 Fourth Street in San Francisco. In 1958 Elvira Hay (victim of the offense charged in count 2) lived in another hotel nearby with John ("Tennessee") Fry. Witness John Jones testified that shortly after 11 p.m. on August 2, 1958, Elvira and Fry had an argument on the street in the vicinity of the mentioned hotels. Fry slapped Elvira, knocked her down, grabbed her around her neck, pulled her to her feet by the lapels of her coat, and displayed a small paring knife. When Fry produced the knife Jones departed.

At about 5 p.m. on August 3, 1958, Mattie Williams, a tenant of the hotel at 293 Fourth Street, discovered Elvira's nude body in the tub of a common bathroom across the hall from the room where defendant lived. Elvira had died by

strangulation. The alcoholic content of her blood was .24 per cent, which showed that she was "very intoxicated" at the time of her death. About her right knee were incisions which had been made after her death. Her pubic hair had been shaved off. The water in the tub contained lye.[1]

On the evening of June 3, 1959, Earlean Mosley (victim of the offense charged in count 1) was in bed in her room at 293 Fourth Street. Her landlady and Mrs. Adams, another tenant of the hotel, called upon her. Earlean complained that she was ill and that her legs ached. At about 9 p.m. Mrs. Adams left Earlean's room and returned with soup for her. When Mrs. Adams returned, defendant and another man were also in the room. The landlady and Mrs. Adams left Earlean's room at about 9:20 p.m.

Shortly after midnight on June 4, 1959, defendant entered the Southern Police Station at 360 Fourth Street. He apparently had been drinking but "he wasn't staggering and his speech was clear and coherent." Defendant gave police officers his keys to the hotel and to his room at 293 Fourth Street. The police, pursuant to statements of defendant, went to his room and found the body of Earlean in defendant's bed. She was covered with a blanket and a pillow was over her face. She had died as the result of strangulation with a necktie which was knotted tightly around her neck. She wore a nightgown and a bathrobe. Her blood contained .28 per cent alcohol; such a person would have been "almost paralyzed, almost in a coma." Earlean's radio was in defendant's room and the padlock and keys to her room were on his dresser.

At 3:30 a.m. on June 4, 1959 (some four hours after the killing of Earlean), a test of defendant's blood showed that it contained .10 per cent alcohol. This would indicate that defendant's blood alcohol content would have been about .16 per cent four hours before. The blood alcohol content which by custom is accepted as a test of drunken driving is .15 per cent.

On the edge of the mattress in defendant's room was a stain of human blood too small for classification as to type.

[1]As appears from extrajudicial statements of defendant which were in evidence and from defense counsel's argument to the jury, John Fry was convicted of manslaughter of Elvira and was serving a sentence therefor in San Quentin State Prison in June, 1959, when defendant killed Earlean and confessed to the two homicides.

(Fry, who had been too drunk to remember the events of August 2 and 3, 1958, pleaded guilty to voluntary manslaughter of Elvira. After defendant confessed, Fry was pardoned on June 19, 1959.)

Defendant pointed out another blood stain on the carpet of his room near the hall door. This stain was human blood of type O. Elvira Hay had type O blood; defendant's blood was type A.

Voluntary statements of defendant to the police, which had been made and recorded on June 4 and 6, 1959, were played to the jury. Because defense counsel as to each count argues the insufficiency of evidence of deliberate and premeditated intent to kill, the substance of defendant's statements will be here set forth in the chronological order of the events, feelings, and thoughts described by him, rather than in the sequence in which the statements were made, so that the manner in which the jury inferentially could have traced the development of the intent necessary to constitute deliberate, premeditated murder may more clearly appear.

Defendant stated that he met Elvira "approximately two weeks prior to the date of her death . . . I made it quite plain to her that I wasn't interested in buying a woman, though I didn't mind spending money for drinks . . ., so she said that was fine, we'd get some wine and go up to her room and drink it, so we bought a fifth of wine and went up to her room and . . . after the wine was consumed, then, of course, I started getting amorous . . . and before we were completely disrobed, she asked me for $5. Well, if she'd have asked me outside, I'd have told her to go to hell . . . but by that time I had gone too far and so I was mad as the devil, but I gave her the $5, but I was so mad that when I had intercourse with her, I couldn't reach a climax, and I . . . got up and stormed out of there, and between that day and the date of her death, I think I saw her once or twice, either on the street or in the hallway, but we had no further contact with each other until the day of her death. . . ."

At about 4 p.m. on August 2, 1958, defendant went to a party given by Elvira's daughter in the hotel where defendant lived. "[P]rior to this, I had been drinking heavy and constantly for well over a month because I was unemployed, and I . . . never got out of bed practically for anything, but to go out and get another drink—another bottle—so I was— my mind was pretty foggy." At the party defendant met Elvira again. After two or three hours "my mind finally got so foggy from drinking I had to get some sleep, so I . . . went back to my room and went to bed. I don't know how long I slept; when I woke up, I had another drink—I had a bottle right by my bed; I got up and walked around the hall to see

who was up . . ." Elvira was in the hall, looking from a window toward the hotel where she and John ("Tennessee") Fry lived. "[S]he said that she was watching for Tennessee . . . and . . . that she was afraid he might kill her, so I told her, 'Well, he can't find you in my room,' so she came to my room . . . and laid on the bed fully dressed and we had a few drinks and I started getting fresh with her—she didn't object to my feeling her . . . but . . . she had on pedal pushers, and I tried to get her to take them off to see if I could get some, and she wouldn't do it, and I just got mad at her all over again, so I took a necktie belonging to myself and eased it under her head without her knowledge, while I was holding her and caressing her and everything so she didn't notice anything, and when I got one end of the tie under her head, I looped the other end around her throat and shoved that under in the opposite direction so I had a hand hold. . . . I just laid there for several minutes, trying to make up my mind—the consequences of what I was doing was so great that I was just on the verge—at least I'm convinced—I don't know how I—what I would have done if she hadn't felt that, but it was —I was thinking then of trying to ease the tie back off and forgetting about this whole thing, but just then she must have felt the cloth around her neck because . . . she jumped. She said, 'What's going on here?' so I—she had me cold then—so . . . I just jerked. I said, 'Now you know.' I held it until she ceased moving. . . ."

In response to the question, "why did you do that to her?" defendant said, "that doesn't sound like a logical excuse, but for one thing, I was mad and I intended to rape her, so I killed her and then I raped her. . . . I was mad because . . . she acts like she's not a hustler, and . . . leads you on, lets you buy drinks and everything, but still she's going to demand money at the last . . . [S]he wasn't straightforward in that manner."

After strangling Elvira with the tie, "I couldn't possibly have her come to life then . . . I'd have been in the penitentiary anyway, so I turned the water on in my sink . . . and held her head down in the water . . . till—I know it was impossible for anyone to hold their breath that long. . . . So then I just pulled her out of the sink and threw her back on the bed. I undressed her and I raped her, then I got the razor and lathered her up and shaved her all down here." Defendant committed various sexual acts upon the body, inter-

mittently sleeping, waking and drinking, and moving the body about the room. During these procedures blood from the body got on the mattress and the floor.

"I . . . had always read where it takes a human body three days for decomposition to set in, so I figured I had a couple days grace before I'd have to get rid of the body, but when I woke up during the day [August 3] . . . there was just the weirdest smell in the room . . . I figured I would have to get her out of there in a hurry." In an attempt to dissect the body defendant made the incisions about the right knee but "I gave up because the knife was too dull. . . . I went out to three different grocery stores. I bought two cans of lye in each store. I came back and . . . put her in the tub, filled the tub with water, and emptied the six cans of lye in the tub." Defendant then returned to his room.

Defendant further stated that after Mattie Williams' discovery of the body and the summoning of the police, a crowd collected with "everybody talking, everybody knew all the answers." "[S]ome other guy stepped up and he claimed that he had seen Tennessee beating his wife [Elvira] up the previous night . . . so the police . . . were all hot after finding Tennessee, so . . . I melted into the background . . . I spent the next couple days . . . keeping myself unavailable."

Thereafter, "about two months prior [to killing Earlean] I was drunk one night and thought about turning myself in on the old case [the killing of Elvira] and I didn't want to go through Southern Station, so I walked all the way down to Kearny and Washington [the San Francisco Hall of Justice], and by the time I got to Kearny and Washington, I had sobered up just enough to fear the consequences of what I had done, so I just walked . . . back home."

From the night of May 31 until June 3, 1959, defendant spent his time drinking, dozing, and reading. On the morning of June 3, "my girl friend" Alice, "the mother of my son," visited defendant in his room. At about 9 p. m. defendant walked with Alice to her bus stop. He returned to his hotel, "looked to see . . . who was up and around," and "saw a light in Earlean's room. So I knocked on her door." At this time "I had known her by sight for about two weeks, but I didn't know anything about her." Defendant had never argued with Earlean, nor been alone with her, been sexually intimate or discussed sexual intimacy with her. When defendant went into Earlean's room on the night of June 3, the landlady and two men who lived in the hotel were present.

Earlean was in bed. "[A]nother girl . . . brought Earlean some soup. Earlean's been sick . . . She didn't want the soup but she wanted a drink, so I told her, well, I'll buy her a drink on the condition that she drink the soup." Defendant sent the other men for sherry. The landlady and the other woman (Mrs. Adams) left. Earlean complained that her legs were sore. The other men returned and the four drank a fifth of a gallon of sherry. The other men left. "I told Earlean I'd take her on— and . . . I had a fifth in my room, but the wine in her room was gone. . . . [She] asked me to rub her legs for her. So I told her, 'Well, come on over in my room and I'll rub them over there.' . . . I wanted to sleep with her . . . Maybe having intercourse, maybe not. . . . I tried all day long to have a climax with Alice and I couldn't. I was too drunk . . . I figured that if I . . . slept in her [Earlean's] bed with her, somebody'd be coming down banging on the door and annoying us . . ."

Earlean, who was dressed in a nightgown and robe, went with defendant to his room. Defendant took her radio with them because his was broken. Earlean "got in bed . . . and laid on her stomach and I put some metholatum on the back of her legs and rubbed . . . and then . . . we continued to drink. . . .

"I got in bed with her and I tried to have intercourse with her . . . [S]he didn't object to anything I did to her. That's — that's what made this — made this killing screwy. But anyway . . . I couldn't reach a climax. . . . So then I got up and . . . I guess she was . . . daydreaming or listening to the radio . . . So I took the necktie and—well, it took me about 15 minutes to slide it underneath her head so she wouldn't suspect anything. . . . So 1 looped it around her neck . . . as if I was caressing her. . . . I just pulled it as tight as I could and . . . she was quiet and I released the pressure on her throat, and . . . she started breathing heavy again, . . . so I went over and I filled ·. . . the basin up with water with the intention of bringing her over and submerging her nose and mouth in the water, because I know darn well then that she couldn't come back to life if I kept her head under water. But when I pulled her off the bed, she was too heavy for me. . . .

"So I let her lay there for a few minutes and I took what was left of her wine in her glass—I drank that. And then what was left of my wine in my glass—I drank that. And then I started drinking out of the bottle." With much effort

defendant dragged Earlean onto the bed again. "I let go of the tie about three times, and each time I let go she started breathing again. . . . [S]o I tied it in a knot. . . . So then I tried to have intercourse with her and I couldn't, so . . . I laid down beside her for a while and her tongue was hanging out. . . . And her tongue annoyed me for some reason or other, so . . . I took my pillow and laid it across her face, and then I laid on top of her and the pillow. . . . Then I decided that I couldn't get rid of her—that it was all over for me. So I got up and I got dressed and I pulled the blanket up across her body."

To the question, "What prompted you to strangle Earlean?" defendant replied, "That I cannot answer. I don't know."

Earlean "had the keys to her room pinned onto her robe . . . I contemplated the possibility of returning the body to her room rather than have it found in mine. So I got up and went to her room, which had a padlock on it. . . . I unlocked the padlock and while I was doing that, I heard a sound as if someone were coming out of another room into the hall, so I put the padlock and keys in my pocket and returned to my room . . . I threw the lock on my dresser and also the keys. . . . I put . . . the remainder of the fifth of wine . . . in my hip pocket. Then I turned out the lights, padlocked the door and went down on the sidewalk . . . I must have spent anywhere from five to fifteen minutes trying to make up my mind whether to hitchhike out of town or to —what to do. . . . I kept thinking of what I had done and the fact that there was no excuse for it, and I also thought of my son, and the future complications that would arrive if I should run and elude the police and find myself in the position of committing the same type crime over again with no motive." Defendant considered going to the Hall of Justice but, recalling the occasion two months before when he had walked there with the thought of "turning myself in" but had not done so, "I didn't figure that would be the right course to take . . . because I'd probably change my mind . . . so I went to Southern Station. . . .

"I asked for Homicide. So the patrolman informed me that . . . there was no Homicide man on duty at the moment. I asked him what time they come on. He said about 8:00 o'clock in the morning. He says, 'Is it something urgent? Is there anything we can do for you?' So I said, 'No, thank you. I'll return in the morning.' So I turned around and

walked out. After I was on the sidewalk I turned around and went back in . . . I told him that I had better . . . straighten this out now . . . And I said, 'Because I might change my mind by the morning.' Which I'm quite sure I would have. . . . I informed him that I had killed a woman and she was on my bed . . . I handed him the keys to my room. . . . And although they seemed slightly skeptical, one . . . said, 'Well, we'll check on it.' . . . And I informed them . . . that I had come to them because I had also killed one previously. . . . I mentioned the fact that I was also guilty of a crime for which another man was in San Quentin . . ."

Defendant's contention that the prosecution must establish that the murders were of the first degree by evidence other than his extrajudicial statements is without merit.

█ "[T]he corpus delicti in a case involving first degree murder consists of two elements, namely, the death of the victim and the existence of some criminal agency as the cause. [Citations.] █ Once prima facie proof of the corpus delicti is made, the extrajudicial statements, admissions, and confessions of a defendant may be considered in determining whether all the elements of the crime have been established." (*People* v. *Duncan* (1959), 51 Cal.2d 523, 528 [1, 2] [334 P.2d 858].) █ "The corpus delicti of the crime of murder having been established by independent evidence, . . . extrajudicial statements of the accused . . . may be used to establish the degree of the crime." (*People* v. *Miller* (1951), 37 Cal.2d 801, 806 [4] [236 P.2d 137], rejecting the contention that "the prosecution was bound to establish by independent evidence the corpus delicti of the crime of attempted robbery, as well as the corpus delicti of the crime of murder, before [defendant's] . . . extrajudicial statements concerning the . . . attempted robbery could be used to prove the degree of the murder.")

█ Here defendant's lucid, introspective description of his mental and emotional processes is sufficient evidence to support the jury's determinations that the murders were deliberate and premeditated in the dictionary meanings of those words, which are their significations in the statute (Pen. Code, § 189) which defines first degree murder. (*People* v. *Thomas* (1945), 25 Cal.2d 880, 898 [13] [156 P.2d 7]; *People* v. *Caldwell* (1955), 43 Cal.2d 864, 869 [3-4] [279 P.2d 539].) █ █ Defendant urges that the evidence of his intoxication "is substantial evidence of the lack of pre-

meditation and deliberation.'' His contention is correct; but the weight to be accorded such evidence was for the appraisal of the trier of fact (*People* v. *Murphy* (1934), 1 Cal.2d 37, 40 [2] [32 P.2d 635]) and since in the circumstances the jury could conclude that the homicides were the result of deliberation and premeditation we cannot accede to defendant's request that we reduce the degree of the murders (*People* v. *Deloney* (1953), 41 Cal.2d 832, 837 [1] [264 P.2d 532]). Significantly available to prevent the drawing of inferences that defendant was so disordered by his use of intoxicants that he did not form the specific intent to kill as a result of deliberation and premeditation are his accounts of his slow and surreptitious preparations to strangle his victims without their becoming aware of his purpose and of his subsequent time-consuming activities designed to insure their deaths, as well as his detailed descriptions (see *People* v. *Murphy* (1934), *supra*, p. 40 [2] of 1 Cal.2d; *People* v. *De Moss* (1935), 4 Cal.2d 469, 473 [2] [50 P.2d 1031]), which correspond with the testimony of prosecution witnesses, of events in Earlean's room before her death and of the condition in which he left the bodies and his room.

Defendant complains that by instructing the jury as to murder in the perpetration of or attempt to perpetrate rape the trial court in effect informed them, erroneously and prejudicially upon defendant's view of the record, that there was sufficient evidence of rape to permit a finding of first degree murder on either or both counts on that theory. The instructions on this subject are quoted in the margin.[2] Also

---

[2] ''All murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of [or] an attempt to perpetrate arson, rape, robbery, burglary, mayhem or any act punishable under Section 288 of the Penal Code, is murder of the first degree, and all other kind[s] of murder are of the second degree.

''Murder which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem or any act punishable under Section 288 of the Penal Code is murder in the first degree, whether the killing was intentional, unintentional or accidental.

''Rape is an act of sexual intercourse accomplished with a female person, not the wife of the perpetrator, where she resists but her resistance is overcome by force or violence and [sic] where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of her assailant to carry out and execute such threats.

''An attempt to commit a crime consists of two elements, namely: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.

''In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual

the prosecuting attorney had referred to the subject in argument to the jury.[3]

A determination that the killing of Elvira was murder in the perpetration of rape by violence could follow logically from acceptance of defendant's account of that killing; the jury could (although they did not have to) believe that in admitting that he intended to and did "rape" her defendant used that word in its legal meaning. (*Cf. People* v. *Thomas* (1945), *supra*, 25 Cal.2d 880, 890 [3], where a defendant's admission that he "laid in wait to catch" his victim "as a matter of law . . . does not on its face and in its context justify the claim on behalf of the state that it constitutes an admission of lying in wait to commit murder.") Since there was evidence that Elvira was killed in order to perpetrate rape the trial court properly instructed upon that theory of murder, although there seems to be no evidence which would support a finding that the killing of Earlean was first degree murder in perpetration of rape, for defendant stated that "she didn't object to anything I did to her," and the condition of her body did not indicate that she had been the victim of violent rape or attempted rape (see *People* v. *Craig* (1957), 49 Cal.2d 313, 318-319 [2a-2b] [316 P.2d 947] ; *cf. People* v. *Brown* (1943), 22 Cal.2d 752, 755 [1, 2] [141 P.2d 1]). The question whether there could be a finding of rape-murder of Earlean under the rule that "Rape is an act of sexual intercourse, accomplished [where the victim] . . . is prevented from resisting . . . by any intoxicating . . . substance, administered by or with the privity of the accused" (Pen. Code, § 261, subd. 4) is not presented, for the jury were not instructed

---

commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense or devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt; but acts of a person who intends to commit a crime will constitute an attempt where they themselves clearly indicate a certain unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."

[3] "Murder of the first degree is that type of murder or killing which occurs in the commission of certain felonies such as robbery, rape, arson, burglary. There are about six of them. The only one which would be pertinent in this case would be the crime of rape. If a murder is committed, or a killing is committed, in the commission of a felony, such as rape, or in the attempt to commit a rape, it is murder of the first degree under our law, whether that killing was intentional, unintentional or accidental."

as to the situation where the accused avails himself of the drunkenness of the victim to commit rape. (See Code Commissioners' note to Pen. Code (1872), § 261, subd. 4.)

Prior to trial defense counsel moved to inspect all statements in the possession of the People, including any statements made to the police by seven persons who had testified at the preliminary hearing in the case against John Fry. These persons had been mentioned in the present case in a police inspector's testimony before the grand jury but they had not been witnesses before the grand jury. Defense counsel had a copy of the transcript of the preliminary hearing in the Fry case. He said, ''[T]here is a person who, although at one time he testified under oath in the matter of John Fry, . . . thereafter he elaborated greatly in that particular matter to the effect, as I understand the testimony before the Grand Jury by the police Inspector, that this person claimed to be an eyewitness to that homicide.'' (Defendant in his opening brief says, and the trial court could have understood, that such person, who is not identified by name, assertedly stated that he saw Fry kill Elvira.)

The trial court ordered that statements of defendant himself be produced. As to the motion to inspect statements of other persons, the court said, ''There is some limitation in obtaining the information that the District Attorney accumulates''; otherwise, ''you would end up with the District Attorney just accumulating all the information and presenting it to the jury. . . . There could be very little reason for the Public Defender's Office or defense counsel to do much preliminary work other than appear at trial and maybe cross-examine the witnesses. . . . [T]he principal purpose . . . of the decisions [concerning pretrial discovery, hereinafter cited] is to make available to defense counsel any statements of individuals for impeachment purposes at the trial. . . . And at this stage of the case I would deny you the use of the statements, if any, . . . of these other individuals, however, with a reservation that if any of these individuals are put on the stand by the prosecution that at that time you may have any statement that is contained in the files of the District Attorney of the individuals put on the stand, and certainly with ample time to examine the statements and to prepare your cross-examination.''

Defense counsel said, ''[T]hese statements . . . are also required in order to properly prepare the defendant's case herein.'' The trial court pointed out that defense counsel

could interview and subpoena these persons whose statements were sought.

Of the seven persons who had testified at Fry's preliminary hearing, three testified at defendant's trial: Mattie Williams (who discovered Elvira's body), John Jones (who observed the altercation between Fry and Elvira preceding her death), and Mrs. Adams (who observed defendant in Earlean's room shortly before her death). The prosecution furnished defendant with a summary of Mattie Williams' statement. Defendant did not renew his request that the statements of the other witnesses be produced. He urges that upon the showing made by him prior to trial his right to inspect was "absolute"; that his failure to renew his demand for inspection at the trial is immaterial because "production at the time of trial cannot aid a defendant in the preparation of his case since it can certainly be safe to say that a witness whose testimony might damage a prosecutor's case would never be called by him."

This court said in *Cash* v. *Superior Court* (1959), *ante*, pp. 72, 75 [3] [346 P.2d 407], "[A]lthough there is a possibility that a defendant [who seeks pretrial disclosure] may be acting in bad faith and may be seeking merely to acquire advance knowledge of the details of the prosecution's case with a view to shaping his defense accordingly, such a possibility is subordinate in importance to the danger of convicting the innocent and does not warrant denying a request for production where there is a sufficient showing that the request should be granted in the interests of a fair trial."

Thus this court has required pretrial production of statements of persons expected to be prosecution witnesses at the trial. (*Funk* v. *Superior Court* (1959), 52 Cal.2d 423, 424 [2a] [340 P.2d 593]; *Vance* v. *Superior Court* (1958), 51 Cal. 2d 92, 93 .[1] [330 P.2d 773].) And "to obtain production of the prior statement of a prosecution witness, a defendant is not required to show that there is any inconsistency between the statement and the testimony of the witness. . . . Ordinarily a defendant cannot show that a statement contains contradictory matters until he has seen it, and, if such a showing were a condition precedent to production, his rights would be dependent upon the highly fortuitous circumstances of his detailed knowledge as to the contents of the statement." (*People* v. *Chapman* (1959), 52 Cal.2d 95, 98 [3] [338 P.2d 428].)

Also the prosecution has been compelled, prior to trial,

to disclose to defendant the names and addresses of eyewitnesses to the alleged crime, to refrain from interfering with defense counsel's right to interview witnesses, and to make available to him real evidence or, when necessary, reports of the state's experts concerning the results of their examination of real evidence. (*Norton* v. *Superior Court* (1959), 173 Cal.App.2d 133, 136 [3] [343 P.2d 139]; *Schindler* v. *Superior Court* (1958), 161 Cal.App.2d 513, 520 [6, 7] [327 P.2d 68]; *Walker* v. *Superior Court* (1957), 155 Cal.App.2d 134, 139-141 [4-6] [317 P.2d 130].)

Here, however, no error in denial of pretrial inspection appears. The court properly denied the blanket request that the prosecution turn over to defense counsel all the statements which it had. Although the defendant does not have to show, and indeed may be unable to show, that the evidence which he seeks to have produced would be admissible at the trial (*People* v. *Chapman* (1959), *supra,* 52 Cal.2d 95, 98 [3]; *Walker* v. *Superior Court* (1957), *supra,* 155 Cal.App.2d 134, 141), he does have to show some better cause for inspection than a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.

Nor does defendant show that denial of his request for statements, if any, of the seven named witnesses who testified at Fry's preliminary hearing was either erroneous or prejudicial. Although defense counsel had a transcript of the testimony of these persons and had opportunity to interview them, so far as the record discloses his only attempt to show to the trial court that any statement of these persons had any significant bearing on the preparation of his defense to the charge of killing Elvira was his assertion that one of them, not identified by name, after he testified in Fry's case, had made a further statement to the police in which he "elaborated greatly" and "claimed to be an eyewitness" to the killing. The trial court at this time had available to it the information contained in the transcript of the testimony before the grand jury in defendant's case (which included the testimony of defendant and Fry) and the reports of the doctors who examined defendant in connection with defendant's plea of not guilty by reason of insanity, and therefore it presumably knew that defendant had repeatedly admitted that he killed Elvira in the absence of any other person. Defendant does not suggest and it does

not appear that he might have proposed as a defense a claim that anyone other than he killed Elvira. Therefore, it does not appear how further investigation into the Fry matter could have aided defendant in preparation of his case.

The trial court was also entitled to consider, as bearing on the strength or weakness of defendant's claimed "showing" (actually, merely an assertion) that he needed the statements to prepare for trial, the facts that defendant was indicted on June 11, 1959, that on July 29, 1959, trial was set for August 10, and that not until July 31 did defendant present his motion that the prosecution be required to furnish these statements.

Nothing developed at the trial to indicate that the refusal to require pretrial inspection of statements harmed defendant. When Mattie Williams testified, the prosecution had furnished defense counsel with a summary of her previous statement. When Mrs. Adams and John Jones were called as witnesses defendant, as stated, did not renew his motion for production of their statements, which the trial court had previously assured him would be granted if they were called. Furthermore, Mrs. Adams did not testify to anything which had to do with the killing of Elvira and Jones did not testify to anything which had to do with defendant. If they had knowledge of matters to which they did not testify at defendant's trial, defendant had opportunity to discover it by interviewing them before trial and to make a showing that he needed their statements as to such knowledge, if any.

The trial judge conducted the trial, and counsel for each party presented his case, with commendable fairness and dignity. In the present state of the law it appears that the jury's solution of defendant's and the People's problems is proper, and that no ground exists upon which we may interfere with the due process of the law to which both the People and the defendant are entitled.

For the reasons above stated, the judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.