[Crim. No. 7144.    Second Dist., Div. One.    Nov. 4, 1960.]

THE PEOPLE, Respondents, v. FRED OTASH, Appellant.

Crowley & Rhoden and Arthur J. Crowley for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of conspiracy to drug a race horse (the order granting probation) and the order denying a motion for a new trial.

In an indictment in Los Angeles County, the appellant, hereinafter referred to as Otash, and others were charged in Count I with conspiracy to violate section 337b of the Penal Code (offering a bribe to a participant in a contest) between December 1958 and June 1959. In Count II Otash, Dave Negri, Lou Kane, Don Lee Wells, Richard Gach, Donald Hinton and Donald Potter, as well as persons whose names were unknown were charged with conspiracy to violate Penal Code, section 337f (administering a drug to a horse in a race) between February 1959 and June 1959.

As to Counts I and II the defendants were also charged with conspiracy to cheat and defraud by criminal means and to obtain money by false pretenses; in Count III Otash and

Gach were charged with violating Penal Code, section 337b on or about January 26, 1959, with reference to a horse race and in Count IV Otash was charged with violating Penal Code, section 337b on or about February 10, 1959, with reference to a horse race. Otash pleaded not guilty. After the jury was impaneled the cause was dismissed as to Gach and Wells on motion of the prosecutor to the end that they could become witnesses for the People, all pursuant to Penal Code, section 1099. Count III was dismissed upon motion of the prosecution after the evidence was presented.

As to Count II Otash and Potter were, by the jury, found guilty. The remaining defendants were found not guilty. Otash was found not guilty as to Count IV and he and his codefendants were found not guilty as to Count I. Otash's motion for a new trial was denied. Proceedings were suspended and Otash was granted probation for five years, one of the terms being that he spend six months in the county jail. Otash has appealed from the judgment of conviction. However, we will consider it as though it were an appeal from the order granting probation and the order denying a motion for a new trial.

A résumé of some of the facts as set forth in the nine volumes of testimony is as follows:

Gach was a former race horse trainer and jockeys' agent and was acquainted with Otash and Kenny Godkins. Gach, while with Godkins, met Otash in December 1958, in the latter's office in Hollywood. Godkins knew Christopher Wells, hereinafter referred to as C. Wells, a jockeys' agent; Don Wells, who owned and trained race horses; Glen Lasswell, a jockey; Arthur Stone, a jockey; Mike Lane, an actor; Buddy Ruskin, Dave Negri, Lou Kane and Don Potter. Gach met Otash in Otash's office about February 4 or 5, 1959, and Godkins and Lane might have been present. Gach told Otash that if they could buy a race horse at the Santa Anita Track he thought they could "cash a gamble" with the horse "if the odds were long enough and if we hopped him or gave him a stimulant." To Gach to "hop a horse" meant to stimulate a horse with a narcotic and to "cash a gamble" meant to win a bet. Otash asked Gach how much money it would cost and Gach replied at least $10,000. Otash related that he had lost some money in a race but that he would invest two or three thousand dollars in a race at Caliente (Mexico) the next Sunday or so and that if the horse he selected won he would put the money in the purchase of a race horse. Gach told of his

being suspended but said that he could secure a trainer from Florida and that such person could be utilized as owner and trainer of the horse. Shortly thereafter Gach had another talk with Otash at his office. Otash stated that if a horse which Godkins had "set up" at Caliente won he would place the money from the bet toward the purchase of a horse.

Stone said that about February 4 or 5, 1959, he came to Los Angeles from San Diego at Godkins' request and was taken by Godkins and Lane to Otash's office. Lasswell was present and possibly Gach. Godkins talked of stimulating horses and suggested that Otash talk to Stone about it. Otash asked Stone what he knew or thought about stimulating horses and Stone answered that it was a "hit or miss affair." Godkins spoke of Otash's having ideas of buying a horse and said they could go into business. During the evening of about February 7, 1959, while Gach was at Otash's office, word was received that the bet on the horse at the Caliente track was won. Otash told Gach to come back the next day. On the evening of about February 9th Gach saw Otash at the office and Otash told Gach to go ahead and find the horse he wanted and then to return and tell him of the price.

Gach had been in touch with C. Wells, who was in Arizona, with reference to fronting for an owner's and trainer's license to the end that a stall could be secured at the Santa Anita Track. Gach arranged for C. Wells to come to Los Angeles. Gach talked to C. Wells about putting a horse in his name and then stimulating it and winning a gamble. C. Wells demurred because his record was good. However, he said he would contact his brother in Florida and he might be interested because he was out of work.

Thereafter Gach, C. Wells and Otash had breakfast at a drug store near Otash's office. Otash asked C. Wells about his qualifications and the advantage of stimulating horses rather than fixing a race. C. Wells related that one would have a "lot better shot" in stimulating a horse. Gach stated that he could improve a horse substantially by stimulation. Otash stated that it sounded all right to him and that Gach should see if he could find the right type of animal and Otash said he would supply the $3,500 for the purchase of the horse.

Shortly thereafter Don Wells arrived in Los Angeles from Florida pursuant to arrangements made with Gach. Gach and the two Wells brothers talked of buying a horse. Gach explained that they planned to stimulate the horse and that Don Wells would lose his license. Such was agreeable to Don

Wells, if he got paid sufficiently. Gach said they would buy a horse "that the odds are already up at least twenty to one on him" and that if they stimulated him Wells should get at least $20,000 back for a $2,000 bet. Don Wells agreed to the proposal.

During February, Gach went with Otash to the apartment of John Abbott, a relative of Kenneth McMillen, an owner of horses at Santa Anita Race Track. Godkins was also present. Otash introduced Gach to McMillen and Gach stated that he wanted to buy a horse, put it into another owner-trainer's name and stimulate it. Gach talked with McMillen about the matter of leasing one of his horses and McMillen stated that he would talk it over with his trainer. Gach considered the sales price of one of McMillen's horses exorbitant. After they left the McMillen place, Otash said that he thought McMillen would eventually come around and offer them a horse for the $3,500 they were willing to pay. A few days later Otash, Gach, Abbott and Godkins went to McMillen's residence and the latter stated that he could not sell at a price less than he had previously offered. Gach asked McMillen if he might be interested in letting them stimulate one of his horses and McMillen stated that it might be worked out. There then followed a discussion with reference to doping horses and the chances of their winning if doped.

Abbott stated that he talked with Otash in the early part of 1959 with reference to the purchase of a horse, Otash having indicated that he had friends in Florida who were interested; that there was a talk at McMillen's residence when Gach and Godkins were present and the purchase of a horse was talked of and that there was some talk about doping a horse.

Patsy D'Amore, owner of a restaurant in Hollywood, recalled an occasion in February 1959, when Otash and Godkins came to the restaurant and asked D'Amore if he wanted to invest in a race horse. D'Amore declined and Otash said among other things that they could buy a "hot" horse and win.

Gach put Don Wells and C. Wells in a motel near the Santa Anita Race Track. The Wells brothers went to the track to look for a horse but did not find one which seemed suitable to Gach. The Wells brothers and Gach then went to the track and inquiries were made by Gach about the horses which might be for sale. Lou Glanberg stated that he had a 6-year-old, sound horse named Wonder Boy for sale. Gach looked at the horse and then indicated to Glanberg that he

knew of a man who was interested in such a horse and that he would send him over. Gach then talked with Don Wells out of the presence of Glanberg and told Wells that Wonder Boy was the horse he wanted and to go buy him. Gach gave $1,000 which he had received from Otash a day or so before to Wells as a down payment for the horse.

Gach went to the motel and the Wells brothers came in a little later with a receipt showing that they had paid $1,000 down on the purchase of Wonder Boy. The understanding was that they would receive the papers on the horse for a balance of $2,000. Gach called Otash on the telephone and told Otash that they had purchased a horse for $3,500, that they had paid $1,000 down and $2,500 balance was owing. Gach had put $500 into the transaction and he extended the price of the horse to Otash. Otash told Gach to come to his office and Gach did so and received $2,500 from Otash. Gach told Otash the horse was perfect for the thing they had in mind. Otash said, "All right, you handle it and let me know if you need any more money." Gach returned to the motel, gave Don Wells $2,000 and told him to pay for the horse. Wells left and returned with a bill of sale showing the horse had been purchased for $3,000. Gach prepared another bill of sale showing the horse had been bought for $3,500 and then went to Ruskin's apartment where Otash, Godkins and Kane were. Gach gave Otash the $3,500 bill of sale and Otash wanted to know when and how far the horse would run, and what Gach thought the odds would be. Gach said they would work with the horse within a few days with a stimulant and see how he responded. Otash asked Gach if he needed any more money and Gach said that he did not need any more.

Gach took the horse to a veterinarian for a checkup. Gach had obtained a liquid in a bottle labeled "antifetamin" from a veterinarian in Arizona. Gach knew of the liquid and knew it would make a horse run faster. Gach extracted some of the liquid from the bottle into a hypodermic syringe, gave the syringe to Don Wells at the motel and told him how to inject the fluid into the horse. Gach then went to the track and saw Wonder Boy in his test run. The drug took effect and Gach then went to the office of Otash and told him that the horse had worked exceptionally well and that he could not see how the horse could lose. Otash stated that he wanted to bet $6,000 on the horse and that he was getting the rest of the money together. Gach indicated that the horse would run in a race the following week.

Peter Fairchild, a television producer, had a talk with Otash at a drug store about two weeks before March 4, 1959, in which Otash said that he owned a part interest in a horse and told him that the O. of the O.K. Stable was Otash. Fairchild said that he had noticed the name of the stable and that Wonder Boy was a "bum." Otash stated that they were going to run the horse in a race at Santa Anita and that the horse had a good chance of winning.

Wonder Boy was entered in a race for March 4. On March 3d, Gach told Otash that he (Gach) wanted to depress some of the other horses in the race to the end that they would be sure to win their bets. Otash told Gach to come by his office and he would see if he could get a depressant. At Otash's office Gach stated that he needed phenobarbitol in liquid form. Later that same day Otash delivered to Gach a bottle of fluid which Otash said contained enough phenobarbitol to depress 30 horses. Gach had had occasion to use such fluid before and noted the size and color of the bottle. Gach talked with Otash about how Gach would get into the stable area that night and depress as many horses as he could.

Gach went back to the motel where he was with the Wells brothers and Potter. Gach asked Don Wells to secure a stable area list to the end that Gach would be able to reach the proper horses for depressing. Gach telephoned Otash and asked him if he could arrange with Godkins to obtain a stable list in the event Don Wells failed to secure such a list. Otash said he would contact Godkins and later Gach talked with Godkins over the telephone. Godkins told Gach to meet him at a location in San Marino. At a designated hour Gach, Negri and Potter went to the location in San Marino and there met Godkins and Lane in an automobile. Gach explained the need of a stable list and Godkins indicated that he would try to secure one and arranged that they should meet that midnight. Gach returned to the motel where he found that Don Wells had a stable list. At midnight Gach went back to the location in San Marino with Negri and Potter and there met Godkins and Lane. Gach sought the aid of Godkins in administering the depressant to the horses. Godkins agreed to assist. Lane stated that he was along because Otash had sent him to see that everything went along all right.

It was arranged that Godkins and Lane would follow Gach to the motel and then would go to the track. The night was foggy and the cars became separated. After waiting at the motel for a time Gach had Negri drive himself and Potter to

the race track. Gach had a hypodermic syringe and the bottle of fluid which Otash had given him. Gach and Potter climbed over the fence and Gach found five of the horses entered in the race with Wonder Boy. Potter held the bottle and Gach administered the liquid to Wonder Boy's competitors.

On the morning of March 4, Gach called Otash and told him he had been successful in depressing some of the horses in the race and that if Wonder Boy was stimulated and everything would be all right, he would meet Otash at the track and give him an "okay" sign. Otash stated that he would not be present but Ruskin would and that they should meet at the fountain in front of the grandstand.

About noontime on March 4th Gach talked with Don Wells at the motel. He had with him a syringe full of the liquid from the bottle received from the veterinarian from Arizona. Gach was going to have Don Wells inject the horse, then he decided to do it himself. It was arranged that they should meet at the barn at the track at about 12:45 p.m. Gach went to the track with Negri and Potter and Gach went to Wonder Boy's stall. Gach saw Don Wells and the latter stated that he would keep watch to warn of anyone's approaching. Potter remained in the tack room next to the stall where Wonder Boy was located and Gach climbed over and dropped down into the stall about three minutes before the horses were due in the receiving barn and injected the substance in the syringe into the neck of Wonder Boy. Gach walked to the fountain and saw Ruskin and signalled to him that everything was in order. Gach then went to the infield of the track and saw that the morning odds for their horse were 50 to one. Within less than 10 minutes the odds went down to eight to five. Gach saw Wonder Boy at the starting gate. There were 11 or 12 horses in the race. He noted that Wonder Boy was sweating, was lively and kept trying to break. At the start of the race Wonder Boy was in front, however he got into trouble and it appeared to Gach that the jockey had to pull the horse up. Wonder Boy came in about ninth. Gach returned to the motel and met Potter and the Wells brothers. Gach accused Don Wells of having the horse held back because of a fear that the authorities would rule him (Don Wells) off the track. Wells denied it. Gach asked to see the bridle bit and noted that there was blood on it indicating that the horse might have been restrained. Gach went to Otash's office. Lane and another person were present. Otash said in effect that Gach had not permitted the horse really to run because of the clos-

ing low odds. Lane said he had lost five or six hundred dollars and Otash, with a stack of pari-mutuel tickets in front of him, stated that he had lost $6,000. Gach explained that he thought the horse had been held back but that he had nothing to do with it. Otash then agreed with Gach and told Gach to see him the next day. A day or so later Gach talked with Otash at his office and inquired about how the horse was and Gach replied that he was all right. Otash inquired about how they could get their money back and Gach suggested that the horse should run a few times up north and lose and when the odds were built up then do the same thing which had been planned at Santa Anita. Otash gave Gach $200 to assist in the costs of transporting the horse to the Tanforan Race Track. Gach and the Wells brothers talked about moving the horse and subsequently he was transported to the Tanforan Track.

Before Gach testified before the grand jury (in early September 1959), Gach talked with Otash at his office and Otash gave Gach two pieces of paper and told him to read off to the grand jury the statements therein set forth. Otash said, ''You can, if you want to, go in and clean me up and I will, in turn, help you out.''

During the trial Otash saw C. Wells in the hallway and arranged for a meeting between them. At the meeting Otash stated that if Wells brought up the truth of the conversations had between Gach and Otash at the drug store that he (Wells) would ''bury'' him.

Godkins (prior to the taking of testimony before the grand jury), on or about July 2, 1959, and on August 25, 1959, talked to Otash over the telephone. The conversations were recorded by means of an induction coil and other electrical equipment. A representative of the district attorney's office listened to the talks by means of earphones. Thereafter, the tape recordings of such conversations were played back in the hearing of the deputy district attorney and he determined that the recordings were true and correct. The July 2d call was made from Lane's residence and Lane and Godkins gave their permission for the installation of the induction coil. The call of August 25th was made from a motel room registered to a representative of the district attorney's office. Godkins gave his permission in each instance to having the calls monitored. The recordings were played to the trial jury. Among other things, Otash made many statements in the recordings to the effect that, ''I'm just trying to get everybody pulled up that I can get to, I mean, you guys certainly aren't helping me, and you're

142

involved in it certainly more than I am, and you're all sitting around waiting for Freddy Otach to do all the——work and put out all the money, you know. I'm getting fed up a little with the deal, to be honest with you. . . . I'd rather get out of here and tell my——story, the true story, and take my beef. . . .

"Well, I tell you one thing, people want to—— me, that's certainly their privilege. I hope they live through it.

" .    .    .    .    .    .    .    .    .    .    .

"I just hope that they——

" .    .    .    .    .    .    .    .    .    .    .

"Well, you can believe that.

" .    .    .    .    .    .    .    .    .    .    .

"Yeah, and they can put that on tape; you can believe that.

" .    .    .    .    .    .    .    .    .    .    .

"Well, I hope they are. Anybody that . . . will never enjoy the day I go, I guarantee you.

" .    .    .    .    .    .    .    .    .    .    .

"Well, Kenny, I have taken them for everyone.

" .    .    .    .    .    .    .    .    .    .    .

"Well, I have for everyone. I'm not singling myself out and leaving anybody on the hook.

" .    .    .    .    .    .    .    .    .    .    .

"What can I protect him on except try to keep these people to keep their ———— mouths shut? . . . You're talking like a ———— kid.

" .    .    .    .    .    .    .    .    .    .    .

". . . some of these ———— people and tell them to keep their ———— mouths shut like I have been doing. . . . It's your . . . too, you know, kid. . . . You're not too ———— interested in going out and protecting the people that could hurt you, are you? I have to get a third ———— hand. Look, Kenny, no one's been accused of any crime and there is an investigation going on and . . . no indictments and no one's been booked. . . . You and Mike set back there and you are shaking in your ———— boots and you're not going out and talking to anyone to cool these people down so they won't go out and embarrass people and I get a third ———— hand and you're supposed to have gone out and done these things. I bet you haven't even talked to the people in San Diego. I bet you haven't talked to Don Wells. The thing to do is for you and Mike to go down and talk to all the people you've done business with that I don't know about and pull them up.

" .    .    .    .    .    .    .    .    .    .    .

"Well, I have taken care of my end of my deal. I have taken care of my end. I don't like the ———— that you and Mike come out to on the phone with me, Kenny.

". . . . . . . . . . . .

"Because I don't like to talk about it on the phone. You have something to say to me you come over here and we'll talk about it.

". . . . . . . . . . . .

"Well, ————, you start saying that I did this and I did that. . . . I don't know what the ———— you're talking about and I don't——

". . . . . . . . . . . .

"It's very simple and if you're ———— smart you'll do the same thing.

". . . . . . . . . . . .

"That's correct."

Otash did not testify in his own behalf.

Appellant asserts that he was convicted upon the uncorroborated testimony of accomplices. The judge instructed the jury that the Wells brothers and Gach were, as a matter of law, accomplices.  ▉ In *People* v. *Lyons,* 50 Cal.2d 245, 257 [324 P.2d 556], after stating that the rule with reference to accomplice testimony was set forth in section 1111 of the Penal Code, the court said:

"The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged. (*People* v. *Brown* (1958), 49 Cal.2d 577, 583-584 [1, 2] [320 P.2d 5]; *People* v. *MacEwing* (1955), 45 Cal.2d 218, 223-225 [2, 3, 6, 7] [288 P.2d 257]; *People* v. *Santo* (1954), 43 Cal.2d 319, 327 [4, 7] [273 P.2d 249]; *People* v. *Simpson* (1954), 43 Cal.2d 553, 563 [4, 5] [275 P.2d 31]; *People* v. *Gallardo* (1953), 41 Cal.2d 57, 62 [5, 6] [257 P.2d 29]; *People* v. *Barclay* (1953), 40 Cal.2d 146, 156 [13a, 14] [252 P.2d 321].)"

▉ In *People* v. *Morrow,* 127 Cal.App.2d 293, 296 [273 P.2d 696], it was said:

"The defendant's admissions, active and passive, and his

declarations constitute corroboration. (*People* v. *Armstrong,* 114 Cal. 570, 573 [46 P. 611]; *People* v. *Sullivan,* 144 Cal. 471, 473 [77 P. 1000]; *People* v. *Richardson,* 161 Cal. 552, 557 [120 P. 20].)''

█ The statements made by Otash in the recorded telephone talks furnish much inculpatory evidence. Otash acknowledged that an investigation was under way and that one of the persons mentioned had been questioned with reference to Santa Anita, he further said that he was getting everybody ''pulled up'' that he could get to, that he was involved, that his associates were waiting for him to do all of the work and put up all of the money and that he would rather tell a true story and take his ''beef,'' that Godkins could believe that no one would take the witness stand, that he was not leaving anyone on the ''hook'' but was taking precautionary or protective measures for everyone, that certain people should keep their mouths shut as he had, that Godkins should ''cool these people down'' and that Godkins should talk to the people Otash did not know and ''pull them up.'' It was for the jury to decide whether the statements made were in anywise inculpatory. The weight of the evidence offered by way of corroboration was for the jury to determine. (*People* v. *Lyons, supra,* 50 Cal.2d 245, 259 [324 P.2d 556].) The statements of Otash demonstrated a consciousness of guilt and they could be deemed admissions of involvement in the matters set forth in the indictment and further such statements could be considered in part as an effort to suppress unfavorable testimony.

Furthermore, Arthur Stone stated that Otash asked him about stimulating horses; John Abbott stated that Otash talked to him about buying a horse and was present at a talk where there was talk of ''doping'' a horse; Patsy D'Amore told of Otash's approaching him and telling him about the opportunity to buy a ''hot'' horse and win at the race track; Peter Fairchild said that Otash told him about two weeks before March 4th that he (Otash) was the owner of Wonder Boy and that he was going to race the horse at Santa Anita and even though Fairchild thought very little of the horse Otash said that Wonder Boy had a good chance of winning.

█ Appellant contends that Stone was as a matter of law an accomplice as to Count II, noting that the Court instructed the jury that Stone was an accomplice as to Count I. The periods of time alleged in Counts I and II are not identical, the conspirators in the respective counts were not the same and different overt acts were alleged in the respective

counts. We think that the conspiracy alleged in Count II was separate and apart from the conspiracy alleged in Count I. (See *People* v. *Cossey,* 97 Cal.App.2d 101, 110-111 [217 P.2d 133] ; *People* v. *Gilbert,* 26 Cal.App.2d 1, 6-7 [78 P.2d 770].)

▮▮▮ Appellant further complains that Stone was promised and accorded immunity by the prosecutor and that therefore his testimony was vulnerable. Stone stated, however, that he was not counting on any help from the district attorney's office with respect to getting back his jockey's license. The weight of the testimony was for the jury to determine. In any event the testimony of Stone was not the only testimony which corroborated the testimony of the admitted accomplices.

▮▮▮ Appellant's next contention is that the agents of the district attorney were guilty of misconduct. Otash asserts that the agents suborned perjury. In an affidavit of Don Wells made in support of the motion for a new trial Don Wells indicated that his brother was coerced with respect to his testimony at the trial. The prosecution submitted many counteraffidavits, including the affidavit of C. Wells, which refuted the statements set forth in the affidavit of Don Wells. The judge, acting within his discretion, resolved the conflict against Otash and he denied the motion for a new trial. (*People* v. *Lyons, supra,* 50 Cal.2d 245, 275 [324 P.2d 556].)

Otash claims also that he was not afforded an opportunity to inspect the statements of himself and other prosecution witnesses previously recorded or transcribed and thereby the prosecution gained an undue advantage. ▮▮▮ The Supreme Court recently held in *People* v. *Cooper,* 53 Cal.2d 755, 770 [3 Cal.Rptr. 148, 349 P.2d 964] as follows:

''Here, however, no error in denial of pretrial inspection appears. The court properly denied the blanket request that the prosecution turn over to defense counsel all the statements which it had. Although the defendant does not have to show, and indeed may be unable to show, that the evidence which he seeks to have produced would be admissible at the trial (*People* v. *Chapman* (1959), *supra,* 52 Cal.2d 95, 98 [3] [338 P.2d 428] ; *Walker* v. *Superior Court* (1957), *supra,* 155 Cal.App.2d 134, 141 [317 P.2d 130]), he does have to show some better cause for inspection than a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.''

▮▮▮ In this case the indictment was filed on September 3d, 1959 ; on October 6th the case was set for trial for November 10th. On November 5th, Otash noticed a motion to produce

all statements, written or recorded, made by all prosecution witnesses and himself. The inspection sought referred to a number of persons as prosecution witnesses whether it was the intention of the prosecution to call them or not. On November the 6th, the motion was denied. On November 10th, before the jury was impaneled a motion by Otash and other defendants to be allowed to inspect statements made by People's witnesses was submitted. On November 16th, after the impanelment of the jury Otash and other defendants remaining as principals in the case made a motion to compel the prosecution to make available to them all statements and documents furnished by the People's witnesses. The matter was submitted with the understanding that the deputy district attorney would ascertain just what statements they, the district attorney's office, did have. It was indicated by the prosecutor that the statements of Gach and Don Wells would be available to Otash as well as the statements made by Otash himself. The deputy district attorney said:

"We have no intention of delivering statements of people who perhaps do not appear as witnesses in this case. In the event we call persons as witnesses who have given us statements in advance, if a proper motion is made we will be happy to comply with the Court's ruling."

On November 17th, the prosecutor delivered to Otash statements made by Gach and Don Wells and delivered to the other defendants transcriptions of statements by those particular respective defendants. Some of the latter statements included conversations in which Otash participated and such were delivered to counsel for Otash. The prosecutor told of the recording which they had in their possession with reference to conversations of the various defendants and stated that they would permit defense counsel to hear any such statements, insofar as a recording involved a particular defendant. The deputy district attorney further said:

"At such time as additional witnesses may be called whose testimony has been recorded or statements have been taken from them we will deliver those statements and make those conversations available."

The court granted a motion of Otash to hear the recording which involved him, and to hear the recordings involving Gach and Don Wells. Otash made motions and the court denied the same to hear all of the recordings, to inspect any statements or hear any tape recordings of any other defendants which related to him, to hear the recordings of Godkins (the People

opposed this until Godkins was used as a witness) and to hear any recording or statements of any prosecuting witness which related to him. The prosecution stated to the judge that at such time as a witness might be called, they would furnish Otash with transcriptions of talks that they prepared from tape recordings and give him an opportunity to hear the recording. The district attorney further indicated that he was not prepared to represent to the court just who would or who would not be a witness, excepting that Gach and Wells would be and Otash had their statements. After the opening statement by the prosecution, Otash's counsel stated that the cause could proceed but that he might have to defer cross-examination of the first witness, Gach, if he had not completed the reading of the transcriptions. No motion was made for any continuance or extension of time. In fact, the recordings were used by Otash in the cross-examination of witnesses.

On December 3d, the prosecution rested its case. On the same date, Otash rested his case. No continuance was requested to the end that he could further examine the transcription or listen to any recording of himself or of any witness.

Otash asserts that Don Wells, in an affidavit on the motion for a new trial, told of how the district attorney had admonished witnesses not to talk to Otash or his attorney and that threats and pressure had been applied to them and that he, Otash, was thereby ''ham strung'' in his preparation for trial. The affidavit discloses in fact that the Wells brothers did contact and talk to Otash and his attorney after the grand jury hearing and before the trial. In any event the affidavit was refuted in practically all of its important aspects. Nothing developed at the trial which would demonstrate or indicate that any refusal to have the pretrial inspection demanded in anywise harmed Otash. There was what amounted to a blanket request by Otash. There is no showing made by Otash that he was unfairly treated or did not have a fair trial.

Otash's next complaint is that the deputy district attorney was guilty of impropriety with reference to the use of peremptory challenges. He asserts that the prosecutor had by reason of the number of defendants a certain number of peremptory challenges and that by waiting until after the jury was selected and then dismissing as to Gach and Don Wells, the prosecution thereby had the advantage of added challenges which it would not have had had the dismissals been made before the jury was selected. The record before this court reflects that the jury was duly impaneled and sworn.

Otash has not provided this court with any authority to the effect that the procedure followed was not proper and legal. Section 1099 of the Penal Code provides that the court may at any time prior to the presentation of the defense, on application of the district attorney direct that a defendant be discharged to the end that he may be a witness for the prosecution. (See *People* v. *Bugg,* 79 Cal.App.2d 174, 176 [179 P.2d 346] ; *People* v. *Aguinaldo,* 3 Cal.App.2d 254, 260 [39 P.2d 505].) In any event there was no miscarriage of justice.

The last contention of Otash is that the evidence was insufficient; that the witnesses for the prosecution were not credible and that such witnesses admitted in some instances to incorrect testimony. (See *People* v. *Holman,* 72 Cal.App.2d 75, 89-90 [164 P.2d 297].) It was for the jury to weigh the evidence at the trial and undoubtedly the trial judge considered the matter on the motion for a new trial.

The judgment (order granting probation) and the order denying the motion for a new trial are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 28, 1960. Schauer, J., and White, J., were of the opinion that the petition should be granted.