[Crim. No. 12257.    Second Dist., Div. Two.    May 4, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE CLIFTON CLARK, Defendant and Appellant.

James A. Wallace, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant was charged with the murder of his estranged wife. He entered pleas of not guilty and not guilty by reason of insanity. During the course of the trial in which he was competently represented by counsel of his own choice, he withdrew the latter plea. After a nonjury trial, the court found him guilty of murder of the first degree and decided that the penalty should be life imprisonment. Judgment was entered accordingly.

The same judgment convicts defendant of assaulting a second victim with a deadly weapon in violation of Penal Code, section 245. He does not question the correctness of this conviction.

## Appellant's Contention

Appellant's sole contention is that the evidence is insufficient to support the trial court's finding that this murder was murder of the first degree. This contention proceeds upon the mistaken assumption that the trial judge was bound to believe and give full faith and credit to appellant's uncorroborated testimony that prior to the killing he had been taking barbiturates and imbibing intoxicating liquor in quantities remarkably prodigious.

On the basis of this self-serving testimony and testimony of expert witnesses given in response to hypothetical questions which required the witnesses to assume the truth of appellant's testimony regarding his alcoholic and drug intake, it is argued that the trial court could not reasonably have found that at the time of this killing he possessed the requisite mental capacity to act with malice aforethought, or with premeditation and deliberation.

## Summary of the Evidence

The victim of this murder, appellant's wife Lorena, left him approximately six weeks prior to November 1, 1965. Following this separation he at all times carried upon his person a loaded revolver. He knew that his wife had applied for unemployment compensation shortly before she left him. At approximately 1 p.m. on November 1, 1965, appellant entered the Department of Employment office in Los Angeles,

where he found his wife standing in line with a friend waiting for her unemployment check. He pressed his gun against his wife's side saying, "I caught you." He held the gun in his right hand and kept his left hand over the barrel as if to conceal the weapon from public view.

When Lorena's friend, Mrs. McDowell, who was standing beside her in a line of people, saw what was happening she yelled, "Run, Lorena, run!" Appellant's wife fled with appellant in close pursuit. His first shot missed her but his second struck her as she was turning behind a counter separating the employees from the waiting members of the public.[1] As his wife slumped to the floor appellant turned and took several steps back towards Mrs. McDowell who ran and hid herself under a desk. Appellant thereupon returned to the prostrate body of his fallen wife and standing over her at close range fired the fatal shots into her head. Appellant then left the scene. He surrendered himself to the police a few days later.

By way of defense appellant testified that he had been drinking heavily since his wife left him although his "diminished capacity" had not prevented him from working steadily on his job as an auto mechanic. He also testified that he had been taking about ten barbiturate tablets each week since 1961 in order to "get high" but he did not take these "Red Devils" on his job.

According to appellant, he started for work as usual on the morning of November 1, 1965, but after driving part way to his place of employment he "changed his mind" and returned to his residence. Appellant could offer no explanation for this decision and did not suggest that it was due to the alcohol he allegedly had consumed that morning, the preceding night or during the previous weeks. He simply stated, "I just didn't want to go to work." He spent the morning working on his 16-foot boat applying a coat of resin to the deck.

Appellant asserted that after completing work on his boat he decided to repair the radiator of his car. To this end he determined to drive some 27 blocks to an auto supply store to purchase radiator flush and some hand soap. Although he conceded that he had no particular brand of radiator flush in mind, he offered no explanation why he drove such a distance to this particular supply house.

---

[1] One of these shots struck a third person in the leg.

Appellant testified that he never went into the supply store because, after parking his car nearby, he "just happened" to cross the street and "peek into" the office of the Department of Employment. He stated that although he had not expected his wife to be there, he had been "trying to get together with her" and did "want to talk to her" so he went in by the side door.

By his testimony on cross-examination appellant disclosed his ability to remember that he entered the employment office by the side door, that he was carrying the gun in his "right pants pocket" and even that his wife was wearing red slacks. He testified that he walked up to his wife and said, "I want to talk to you, Lorena." His wife looked at Mrs. McDowell who shook her head and then "pushed" his wife into him and "told her to run or something." He testified that he remembered nothing thereafter until he "woke up" in his car later in the day and heard on the radio that he was wanted for killing his wife and wounding another person.

Appellant explained that he had possessed the revolver since the "riot"[2] and stated that he had had a fight with his brother or brother-in-law some six weeks before the murder. However, he did not elaborate on the nature of this quarrel and did not indicate that he was afraid of this person or that he expected to encounter him that day or any day. Rather he testified that he carried the revolver with him at all times and used it to "shoot at rabbits" at his place of employment.

One psychologist called as a defense witness testified that he had tested appellant and found that he had a very low I.Q. It was his opinion that if appellant had consumed as much alcohol and barbiturates as he claimed, he would be incapable of premeditating his crime. A doctor who specialized in pharmacology testified that although he had never met appellant, the person described by the hypothetical question put to him by appellant's counsel could not "possibly have conceived or deliberated or thought about murder or the intent of murder with the amount of alcohol and secobarbital which you described there."

Parenthetically, it might be observed that it would scarcely require the opinion of an expert to establish the fact that a person such as described in the hypothetical question would be incapable of any rational thought at all, i.e., a person who had been drinking a quart and one-half of whiskey a day and

---

[2]Apparently a reference to the Los Angeles riots of August 1965.

who had consumed a pint of whiskey and taken 200 milligrams of seconal two hours before a given event. As the pharmacologist aptly noted, "With this much alcohol and this much barbiturates, acting in concert, I find it very difficult to believe the man could have held any thoughts for any significant period of time, either good or bad."

Finally, a doctor testified that he had administered an electro-encephalograph test to appellant and found that he displayed an abnormal brain function after consuming alcohol. He testified, however, that this was not an unusual condition and he had found similar reactions in approximately 14 percent of the people he had tested. Not having examined appellant, he had no opinion whether by reason of his brain condition appellant "would be less inclined to premeditate, the same, or more inclined" than a person without such a condition. He testified that if a person in appellant's physical condition drank as much as he claimed, he might simply go to sleep, or might become destructive, or might "do anything else in the world" since there was no predictability in such matters.

The foregoing summary of the evidence suffices to demonstrate (1) that the trial judge had good reason to disbelieve the portions of appellant's testimony which constituted the foundation of his defense; and (2) that the actions of appellant during the several hours immediately preceding the murder and at the time of its perpetration were such as to lend ample support to the finding that appellant had acted with malice aforethought and that he had deliberately planned and premeditated the cold-blooded murder which he took such careful pains to finalize.

As we have indicated, the substance of appellant's argument is that the trial court should have accepted the expert witnesses' testimony that a person in the condition described in the hypothetical questions put to them would be incapable of first degree murder by reason of his "diminished capacity."

However, the point wholly overlooked by appellant is that there is not one shred of evidence other than his own self-serving statements to indicate that he was in the condition or had consumed intoxicants in the amounts posited to the experts. In fact, appellant's own description of his activities indicating the extent of his physical and mental abilties on the day in question and, most importantly, his actions at the scene of the killing are enough to negate the premises of the

hypothetical questions. Certainly his actions in pursuing his wife, shooting her in flight with a deadly accurate aim, systematically administering the coup-de-grace to her prostrate body, and then effecting an escape most obviously are not those of an incompetent inebriate on the verge of total anesthesia.

The appellant in *People* v. *Cooper,* 53 Cal.2d 755 [3 Cal. Rptr. 148, 349 P.2d 964], advanced the same argument in a very similar factual context. In rejecting it, the Supreme Court used language equally applicable here: ''Defendant urges that the evidence of his intoxication 'is substantial evidence of the lack of premeditation and deliberation.' His contention is correct; but the weight to be accorded such evidence was for the appraisal of the trier of fact (*People* v. *Murphy* (1934) 1 Cal.2d 37, 40 [2] [32 P.2d 635]) and since in the circumstances the jury could conclude that the homicides were the result of deliberation and premeditation we cannot accede to defendant's request that we reduce the degree of the murders (*People* v. *Deloney* (1953) 41 Cal.2d 832, 837 [1] [264 P.2d 532]). Significantly available to prevent the drawing of inferences that defendant was so disordered by his use of intoxicants that he did not form the specific intent to kill as a result of deliberation and premeditation are his accounts of his slow and surreptitious preparations to strangle his victims without their becoming aware of his purpose and of his subsequent time-consuming activities designed to insure their deaths, as well as his detailed descriptions (see *People* v. *Murphy* (1934) *supra,* p. 40 [2] of 1 Cal.2d; *People* v. *De Moss* (1935) 4 Cal.2d 469, 473 [2] [50 P.2d 1031]), which correspond with the testimony of prosecution witnesses, of events in Earlean's room before her death and of the condition in which he left the bodies and his room.'' (PP. 765-766.)

█ Since the function of determining the credibility of witnesses and the weight to be given to their testimony remains peculiarly within the province of the trier of the fact (*People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal. Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Kemp,* 55 Cal.2d 458, 471 [11 Cal.Rptr. 361, 359 P.2d 913]), this appellate court must presume that the learned trial judge found appellant's testimony unconvincing in the light of the contradictory evidence and properly rejected it. █ With this determination the entire force of the expert testimony

also was eliminated since it was founded solely upon the assumption that appellant was in the condition described in the hypothetical questions propounded.

There being no other expert medical evidence, either undisputed or conflicting, tending to establish appellant's "diminished capacity," the decisions in the factually dissimilar cases of *People* v. *Goedecke,* 65 Cal.2d 850, 855-858 [56 Cal.Rptr. 625, 423 P.2d 777]; *People* v. *Nicolaus,* 65 Cal.2d 866, 876-878 [56 Cal.Rptr. 635, 423 P.2d 787]; and *People* v. *Wolff,* 61 Cal.2d 795, 818-822 [40 Cal.Rptr. 271, 394 P.2d 959], do not support the contentions of appellant in the case at bench.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 28, 1967.