[Crim. No. 4474.   Third Dist.   Apr. 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. TERRELL LANDRUM, Defendant and Appellant.

Robert Carl Anderson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—The appeal is from a judgment after a conviction for second degree murder.

Assignments of error are: (1) failure of the trial court to give, on its own motion, an instruction on involuntary manslaughter; (2) that the evidence was insufficient to support the second degree murder conviction. There is no merit to the second contention. The first contention is sound and requires reversal.

The victim was John William Edwards. Defendant Landrum shot and killed him at approximately 1:30 a.m. December 3, 1966 in the parking lot of a bowling alley in Sacramento County known as South Bowl.

The events leading to the killing were: defendant had been at the South Bowl in the afternoon and evening of December 2d and evidence showed he had been drinking heavily. At around 11 p.m. he called in his automobile, for a Geraldine Foster at her home. She joined him and they drove to South Bowl. Defendant told Miss Foster he had been drinking but to her he did not appear to have been drinking.

At the time defendant's right arm was in a cast due to a previous fracture. He was right-handed.

The couple arrived at South Bowl and defendant parked the automobile in the parking lot in front of the establishment. As they got out of the car defendant removed a revolver from his coat and placed it in the console dividing the front seats.

Defendant and Miss Foster joined friends, Beverly Chapman and Sylvia Brown, at a table. The time was around 11:30 p.m. From then until shortly before 1:30 a.m. the group was "drinking pretty heavy." During this period defendant stayed at the table most of the time but left occasionally to visit other friends on the premises and to dance. Miss Foster also visited at other tables with acquaintances. Apparently she was away from the table most of the time.

Shortly after 1 a.m. Miss Chapman and Miss Brown, then alone at the table, were joined by Edwards. Thereafter Miss Brown left the table. While Edwards was sitting with Miss Chapman defendant approached the table. He asked Miss Chapman whether Edwards was bothering her. Although her reply was negative Edwards asked defendant: "What if I am bothering her?" A quarrel ensued. Meanwhile Miss Brown had returned. She, as a prosecution witness, testified: that defendant told Edwards "if my arm wasn't busted you'd be dead;" that Edwards replied he wasn't afraid of defendant; that this was followed by an invitation by defendant to Edwards to go outside which Edwards accepted. The two men had left with Edwards stopping at the bar en route to finish a drink.

Some of the subsequent activities of the two men were recounted by Miss Foster, as a prosecution witness, and by one Jim Enos who testified for the defense. Miss Foster and Enos were standing by the front door of South Bowl. Miss Foster saw defendant and Edwards in the parking lot about 120 feet away. They were a few feet apart and apparently arguing. She saw defendant jump back and then push Edwards. Defendant reached into his pocket and took out a gun. Miss Foster saw defendant shoot Edwards. Enos described the shooting somewhat differently. He said he had seen Edwards push or swing at defendant who moved back. Enos heard no shot fired nor did he see a muzzle flash. However, he saw Edwards fall to the ground.

Miss Foster ran to Edwards lying on the ground. The shot had pierced his chest and was fatal. Defendant started to

leave and Miss Foster screamed for him to remain. He got into his car, however, and drove slowly out of the lot and away.

He went to the home of his ex-wife in Broderick, Yolo County, arriving there about 2 a.m. Present were the former wife, her sister, Linda Decker, and other persons. Miss Decker was a prosecution witness. She testified: Defendant, while in the house, fired a shot from his pistol into the ceiling. He stated that he had had some trouble at South Bowl and he had shot a man but didn't know whether he was dead. While there he called South Bowl and asked "if the cat was dead." Miss Decker who on previous occasions had seen defendant when he had been drinking, also when sober, gave her opinion that he appeared to her to be "very sober."

Defendant was arrested at the home of his sister in Sacramento during the early morning hours.

Defendant testified at the trial. His testimony included an opinion of the reputation of Edwards for violence. He stated it was bad. (That opinion was confirmed by the prosecutor called as a witness.) Defendant stated as his reason for leaving the bowling alley that Edwards was "very mean . . . very vicious and nobody to mess with." He was afraid of Edwards.

He said he had left the bowling alley alone and had intended to get into his car and leave without Miss Foster. (He stated she could go home with the other women.) As he was getting into his car he was struck from behind. The blow caused him to fall into the car. He turned and ascertained that his assailant was Edwards. When Edwards continued to hit and kick him defendant reached for his gun in the console. When Edwards saw defendant emerge from the car with the pistol, he backed away some 40 or 50 feet. Defendant followed him until Edwards stopped. Defendant then put the weapon into his pants' pocket, saying: "O.K., you win. It's over." But Edwards then approached defendant again. Defendant pushed him back and drew the revolver from his pocket. It had been uncocked, according to defendant, when he had put it into his pocket. Edwards "drew back to swing" at him and defendant ducked. As he did so the gun went off. (The aim, intentional or unintentional, was excellent.) Defendant recalled none of the subsequent events of the night until he reached the home of his sister with whom he resided. He stated he had consumed approximately 20 drinks of hard

liquor (vodka with an orangemix) during the afternoon and night.

The revolver was a double-action gun with a hammer. It required a 10-pound pull of the trigger to fire it when it was uncocked. Cocked, a 3-pound pull of the trigger would fire the pistol.

## The Court's Failure to Instruct On Involuntary Manslaughter.

Involuntary manslaughter is the unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." (Pen. Code, § 192.)

The jury was not instructed on involuntary manslaughter.[1] No instruction on that degree of homicide was requested. Had it been requested, no problem would exist; an instruction on involuntary manslaughter would have been required. Defendant had two theories: (1) self-defense—justifiable homicide, and (2) involuntary manslaughter, i.e., that he had fired the revolver accidentally. The evidence of involuntary manslaughter was "deserving of consideration."[2] (*People* v. *Modesto* (1963) 59 Cal.2d 722, 727 [31 Cal.Rptr. 225, 382 P.2d 33].)

A defendant is entitled to have the jury instructed on his theory of the case *as disclosed by the evidence.* The evidence may not be of a character to inspire belief. An instruction based upon the hypothesis that it is entirely true must nevertheless be given—if, as stated, it is "deserving of consideration." (*People* v. *Modesto, supra*;[3] *People* v. *Miller* (1962) 57 Cal.2d 821, 829 [22 Cal.Rprt. 465, 372 P.2d 297]; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].)

---

[1]The jury was instructed: (1) on first degree murder; (2) on second degree murder; (3) on voluntary manslaughter; and (4) on justifiable homicide.

[2]It is stated in *People* v. *Modesto, supra*, at page 727: "It was error to refuse the instruction [on involuntary manslaughter] if there is any evidence of manslaughter *deserving of consideration.* (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281]." (Italics ours.)

[3]We quote again from *Modesto* (on p. 729 of 59 Cal.2d) which in turn quotes from *Carmen, supra*: " '[J]ury instructions must be responsive to the issues. The issues in a criminal case are determined by the evidence. . . . *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citing cases.] *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.' "*

The *Carmen* case is direct authority to the effect that evidence, however weak, is within the ''exclusive province of the jury.''

The judgment which must be exercised by a trial judge in determining whether a defense theory, although (in the judge's opinion) based upon evidence so weak that it is incredible, not of a character to inspire belief, is nevertheless ''deserving of consideration'' is indeed a delicate one. The facts of this case seem to illustrate the delicacy of the decision to be made.

The evidence here pointing to a possible accidental shooting had several facets. (1) Defendant testified that that day he had consumed approximately 20 drinks of vodka, most of them during the period shortly before the fatal shooting. The Attorney General argues that because he did not actually say he was drunk, we must assume he was not. We do not think so. He did say he was under the influence of alcohol; also that he remembered nothing between the time of the shooting and the time he reached his sister's house. The facts speak for themselves. (2) To the fact of defendant's probable intoxication must be added the circumstance that defendant testified he pulled an uncocked double action revolver from his trousers' pocket as he ducked. The gun had a hammer. It is conceivable it could have become cocked during this maneuver. It is conceivable that the fact it had become cocked could have escaped defendant's notice in his perhaps befuddled conditions. (3) If the foregoing circumstances are assumed then defendant was wielding a pistol with a trigger with a 3-pound pressure pull rather than one with a 10-pound pressure pull. The Attorney General argues that he did not say that the discharge of the gun was accidental. His testimony, on the contrary, *is* susceptible to that interpretation. He testified: ''I pulled the gun from my pocket and I ducked and when I ducked the gun went off.''[4] There was no defense testimony that he intended to pull the trigger. Again the possibility that

---

[4] He repeated this testimony on cross-examination as follows: ''Q. What did you do when he came toward you? A. I pushed him with my left hand. Q. You pushed him with your left hand? A. Yes, sir. Q. And then what happened? A. Then he came toward me again. Q. What did you do? A. I pulled the gun out. Q. Then what happened? A. Then he made a motion to swing and I ducked. When I ducked the gun went off.''

Later he testified: ''Q. Would you demonstrate, please, how you ducked and the gun went off? A. I just ducked to my left (indicating). Q. You ducked to your left? A. Yes, sir. Q. It won't go off now; but, as you duck, make it go through a cycle? A. (Witness demonstrating.)''

the firing of the gun by an intoxicated right-handed man holding it in his left hand while warding off an expected attack was accidental is not beyond belief. Unlikely? Evidence not of a character to inspire belief? Perhaps—but those are not the tests.

We are, of course, bound by the rules enunciated by our Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Rules must be considered in a context of facts. We find the facts here at least as ''deserving of consideration'' as the facts in *People* v. *Modesto, supra,* 59 Cal.2d 722. There defendant had by separate acts (in sequence) killed a 12-year-old girl and a 9-year-old girl while wielding a sledgehammer with a 4-pound head. He hit each of the girls three of four times. He tried to dispose of the body of one of them. He testified his intent was to frighten the older girl because she had been acting ''snotty and smart aleckie, and just to kind of get back at her for a lot of things she said.'' The younger of the two girls he had intended to frighten because she awakened while he was in the process of shaking the alleged ''smart aleck.'' He had consumed, throughout the day, 18 cans of beer and was intoxicated. A conviction was reversed for failure by the trial court to give an instruction on involuntary manslaughter.

### *Obligation of the Trial Court To Instruct On Involuntary Manslaughter Sua Sponte.*

There is a difference between *Modesto* and the case before us. In *Modesto* the defendant had requested an instruction on involuntary manslaughter. None was requested here.

■ Even though not requested to do so the court has a duty to give instructions on general principles of law governing the case; it need not instruct on specific points. That rule was asserted by our Supreme Court in *People* v̇. *Warren,* 16 Cal.2d 103, 117 [104 P.2d 1024]. A later case frequently cited, *People* v. *Wade* (1959) 53 Cal.2d 322, states at page 334 [1 Cal.Rptr. 683, 348 P.2d 116]:

■ ''. . . On final analysis, the question before the court becomes that of determining whether, in relation to the case at bar, second degree murder is a 'general principle of law' or a 'specific point developed at the trial.' The cases involving the problem of distinguishing between general and specific points and principles fail to lead to a more refined definition of the general statement of the *Warren* case.

''The rule seems undoubtedly designed to promote the ends

of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.''

Commenting on the failure of the court to instruct on second degree murder under the facts before it the court in *Wade* also stated (on p. 335) : ''Defendant's theory of the case was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it. . . . Omniscience is not required of our trial courts.''

In the recent case of *People* v. *Bauer* (1966) 241 Cal.App. 2d 632 [50 Cal.Rptr. 687] (hearing denied) the court observes (on p. 643) : ''If the rule were otherwise, isolated sentences plucked from the cold record upon appeal might suggest in almost every case a far-fetched defense which the trial judge had overlooked.''

On the other hand in what appears to be the Supreme Court's latest expression of the rule, in *People* v. *Wilson* (1967) 66 Cal.2d 749, 759-760 [59 Cal.Rptr. 156, 427 P.2d 820], failure of the court to instruct under Penal Code, section 417 was held to be error where defendant's testimony was that he had entered an apartment intending only to ''scare the occupants of the apartment'' and not to harm them. (Two were killed; one was wounded.)

Each case must be determined on its own facts. On direct examination defendant's allusion to a possible accidental shooting was limited to the one statement quoted above: ''I ducked and when I ducked the gun went off.'' But this was repeated on cross-examination twice. When asked ''Are you telling me it went off accidentally?'' there was no response. He stated, however, he had not shot Edwards intentionally; that he had never fired a revolver and he had never fired any pistol with his left hand before.

His testimony on cross-examination was: ''Q. As a matter of fact, you intended to shoot him with that gun, isn't that right? A. No, sir.''

Defense counsel submitted only three special instructions.

None of them related to the question of an accidental shoot-ing. We recognize it is quite common for the district attorney to include among instructions submitted to the court in criminal cases those favoring the position of the defense. That is not to excuse failure by defense counsel to submit instructions himself. It is to explain, however, the meaning of the following excerpt from defense counsel's argument:[5]

"Now, in connection with that I'd like you to listen specifically to one instruction that I'm sure his Honor will give, which has something to do—and it says something in this way: that when there are two reasonable constructions to be placed upon any given fact or a set of circumstances, the construction of that testimony and of that evidence which leans towards the innocence of the defendant is the one that you must choose."

Later in the same argument he stated: "You will hear his Honor read these instructions to you as all of the instructions, and you have heard the evidence and I am sure that there is no question there. The only question that I could see that there would be any possible question, and *I'm sure that his Honor will give you the instructions on manslaughter, and there are two kinds. There's voluntary and involuntary.*

"Now, ladies and gentlemen, I could stand here in all propriety or properness and—or what have you—and read those to you, but I don't think that that's necessary because I feel that after you listen to his Honor read those instructions to you that there is only one possible thing that this boy could possibly be guilty of. And I'm not saying that he is, believe me, I'm not because I believe thoroughly that this is a self-defense case. And the only reason I'm going into this is merely because I feel that I would be remiss after Mr. Reagor has gone through all of these things that I don't have something to say about them." (Italics ours.)

In his opening argument the district attorney had adverted to an accidental killing. He said: "[B]*ut then assuming it went off accidentally while he was under attack,* I think you would be quite justified in then entertaining a reasonable doubt as to—that any homocide [sic] occurred here at all. That is, if you take Mr. Landrum's version of this case." (Italics ours.) The prosecuting attorney also invited the jury

<hr>

[5]This court deemed the question on the point before us to be close enough to cause the arguments to be transcribed to the end that we could better understand how strongly the matter of accidental shooting was before the court and jury when the latter was instructed.

to take the pistol with them into the jury room and experiment with it. He said:

"Now, once again, experiment in there with this gun. Make sure it is empty. It opens with this side latch here, and when it is closed, the latch is back. And when you push it forward, you can push the cylinder to one side. And if you look at it and there is nothing in any of these chambers (demonstrating) it is empty. Try that pull. *Accidentally?* I think we had it clearly established that when it was discharged from a cocked position what the trigger pull was. And by stipulation the evidence shows it was three pounds. It was discharged where that trigger pull was over ten pounds.

"As I said, if you took Mr. Landrum's version of this, if it was uncontradicted, if it were absolutely uncontradicted, there would be no necessity for being here.

"But it is not uncontradicted. . . ." (Italics ours.)

Although the question is a close one, we have concluded that the defense theory of an accidental shooting was sufficiently before the jury to require the court to give an instruction on involuntary manslaughter *sua sponte.* In *People v. Lewis* (1960) 186 Cal.App.2d 585 (hear. den.) this court said at page 599 [9 Cal.Rptr. 263]: "In this case the issue of manslaughter arose and was 'closely connected' to the evidence introduced concerning defendant's statements as to what occurred at the scene of the crime. That evidence, if believed, suggests the possibility of a verdict of manslaughter, and it is believed that this hypothesis is not so abstruse as to require a request for the instruction to have been made by the defendant. It is immaterial that a defendant's main defense is based on the theory of self-defense. Under Penal Code, section 1127, the trial court must state to the jury *all* matters of law *necessary for their information.* [Citation.]" The quotation from *Lewis* is applicable here.[6]

When error is committed by the failure of the court to give a proper instruction the majority opinion in *People v. Modesto, supra,* 59 Cal.2d 722, has ruled out consideration of

---

[6] We have filed, almost contemporaneously herewith, our decision in *People v. Chapman, ante,* p. 149 [67 Cal.Rptr. 601] 3 Criminal No. 4665. In the opinion therein and under the facts of that case we determined it was not the duty of the trial court to instruct *sua sponte* on involuntary manslaughter. Herein we decide it was the court's duty to give such an instruction. As we have stated above, decision on this question must be on a case-by-case basis. Each case depends upon its own facts. The rule, although flexible, remains constant. We will not compare the facts of the two appeals. They speak for themselves to illustrate the distinguishing differences between the two.

California Constitution, article VI, section 4½ (now article VI, section 13). On page 730 the court states: ''Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right [i.e., the constitutional right to have the jury determine every material issue presented by the evidence] cannot be cured by [said constitutional provision], for the denial of such a right itself is a miscarriage of justice within the meaning of that provision.'' We must, therefore, follow the rule excluding the constitutional provision here.

### Sufficiency of the Evidence To Prove Second Degree Murder.

Second degree murder is unpremeditated murder with malice aforethought.[7]

There was substantial evidence that throughout the events of the night defendant appeared sober. The jury had only defendant's testimony as to the enormous quantity of liquor he had consumed. No expert testimony compelled a finding of alcohol-induced diminished capacity, ruling out malice aforethought. Substantial evidence supported an implied finding that defendant and not Edwards had provoked the quarrel—in fact had provoked it with a cool truculence belying heat of passion. We have quoted the evidence that defendant had used the fact of his disabled right arm as the reason why Edwards was not ''already dead'' almost at the outset of the quarrel. In fact inferences from the evidence might possibly have justified the jury in a belief beyond a reasonable doubt that defendant called Edwards outside to kill him; in short, that the murder was premeditated. That we need not decide. The fact, however, that the jury might have been justified in finding first degree murder does not preclude affirmance of a determination that there was a killing with unpremeditated malice aforethought. (*People* v. *Clark* (1967) 250 Cal.App.2d 681, 686 [58 Cal.Rptr. 660].)

The judgment is reversed.

Friedman, J., and Regan, J., concurred.

---

[7]The code definition (Pen. Code, § 189) is one of exclusion referring back to Penal Code, section 188. Sufficient for our discussion here is our statement in *People* v. *Butts* (1965) 236 Cal.App.2d 817, 827 [46 Cal.Rptr. 362]: ''Conviction of second degree murder requires no proof of premeditation or even of actual intent to take life; rather, the malice (intent) necessary to consitute second degree murder may be implied from commission of an unlawful act without sufficient provocation 'or when the circumstances attending the killing show an abandoned and malignant heart.' [Citations].'' The discussion in *Butts* goes on to explain that when

the killing results from assault with a deadly weapon in a manner endangering life and the jury concludes from adequate proof that the act is neither justified nor mitigated by influence of passion no further proof of malice or intent to kill is required and malice is implied. (See: *Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374]; *People* v. *Logan,* 175 Cal. 45, 48, 49 [164 P. 1121].)